THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim No.: 22-cr-133 (CKK) |
| | : | |
| v. | : | VIOLATIONS: |
| | : | |
| HAIDER ALI | : | 18 U.S.C. § 371 |
| | : | (Conspiracy) |
| Defendant. | : | |
| | : | 18 USC § 1344 |
| | : | (Bank Fraud) |
| | : | |
| | : | 7 D.C. Code § 2506.01 |
| | : | (Unlawful Possession of a Large Capacity |
| | : | Ammunition Feeding Device) |

**STATEMENT OF OFFENSE IN SUPPORT OF GUILTY PLEA**

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, HAIDER ALI, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

*Summary of Unlawful Conduct*

*Conspiracy*

1. From beginning as early as June 2020 and continuing through April 2022, ALI, Arian Taherzadeh and Subject 1 falsely assumed and pretended to be officers or employees acting under the authority of the United States government, specifically the Department of Homeland Security (DHS), the Department of Justice (DOJ), the Office of Personnel Management (OPM), other federal departments and agencies, and acted as such. ALI, Taherzadeh, and Subject 1 were

1

never, in fact, employees of the DHS, DOJ, OPM, or any United States government agency.

2. In furtherance of their false and fraudulent conduct, ALI, Taherzadeh, and Subject 1 conspired to, and in fact did, the following:

   a. create an entity called United States Special Police (USSP);
   b. operate USSP;
   c. recruit other individuals to USSP and a fictitious DHS "task force";
   d. defraud apartment complexes (including the Crossing, Carver Apartments, and Sonnet, all luxury Apartment complexes in the District of Columbia) by obtaining leases under false pretenses by purporting to be officers and employees of law enforcement agencies and by later failing to pay the rent; and
   e. attempt to use and did use a false and fraudulent affiliation with DHS and other government agencies to ingratiate themselves with members of federal law enforcement and the defense community, including by providing members of the United States Secret Service with gifts worth over $90,000.

*The Conspirators Use USSP to Impersonate DHS Agents and Recruit Personnel*

3. United States Special Police LLC (USSP) was a Washington, D.C., limited liability company, with a registered address associated with a residence maintained and controlled by Taherzadeh. Taherzadeh was the beneficial owner of USSP.

4. On USSP's website, USSP was described as a private law enforcement, investigative, and protective service headquartered in Washington, D.C. The website stated that USSP can provide law enforcement, protective services, and investigative services within a contracted jurisdiction. ALI and Taherzadeh represented themselves to law enforcement as

2

investigators and/or special agents with USSP.

5. USSP was not associated or affiliated in any way with the United States Government, nor had it ever done business with the United States Government or the District of Columbia, including, but not limited to, DHS and the District of Columbia Metropolitan Police Department (MPD).

6. After January 2021, ALI helped fund USSP and paid for general expenses. ALI would often carry large amounts of cash and would use the cash to pay for USSP items and expenses, in furtherance of the impersonation scheme. A majority of these funds were the proceeds of the bank fraud scheme further described below.

7. In furtherance of the impersonation scheme, ALI drove a vehicle with police lights in it. According to Taherzadeh, ALI was never tasked with doing any work on behalf of DHS or any other government task force or agency.

8. On several occasions, ALI and Taherzadeh sought to recruit individuals to join their "task force" or "unit," which these individuals believed to be part of DHS and federal law enforcement. ALI's and Taherzadeh's impersonation of federal law enforcement was a critical and necessary component of the "recruitment process."

9. The following steps were taken in in furtherance of ALI's and Taherzadeh's efforts to recruit individuals to their "task force":

10. In their assumed persona, ALI and Taherzadeh told false and fictious stories about their background to advance the recruitment scheme. For instance, ALI falsely claimed, at various times, that he was a member of DHS and/or the United States Secret Service. ALI also falsely claimed that he participated in the capture of the wife of Joaquin "El Chapo" Guzman, that his

3

family was of the royal bloodline of the prophet Mohammad, that he was a Calvin Klein model, and that he had a connection to a senior official with the Inter-Services Intelligence, the Pakistani Intelligence Service. In furtherance of his deception, ALI utilized photos of current and former government officials, obtained in the course of his work as a driver with a car service, to portray himself as a legitimate federal employee. Taherzadeh falsely claimed to be a former Army Ranger, a former United States Air Marshal, a Special Agent with DHS, and a member of a multi-jurisdictional federal task force. In addition, Taherzadeh falsely claimed that he previously worked on cases related to child exploitation and undercover cases involving confidential informants, one of whom he falsely claimed to have killed in a shootout.

11.     In or around February or March of 2021, Taherzadeh falsely told Recruit 2 he was Special Agent with Homeland Security Investigations (HSI). ALI falsely represented to Recruit 2 himself to be a federal official of the Office of Personnel Management (OPM) with investigative authority. Taherzadeh told Recruit 2 that USSP was setup and funded by the federal government. Specifically, Taherzadeh told Recruit 2 that USSP was setup as a private organization in order to allow the government to avoid record requests under the Freedom of Information Act (FOIA).

12.     In or around May 2021, Taherzadeh told Recruit 2 to be "deputized" through the MPD as a Special Police Officer, which Taherzadeh claimed would allow Recruit 2 to assist ALI and Taherzadeh in HSI operations. Taherzadeh instructed Recruit 2 fill out a detailed application with MPD, which was notarized. In addition, Taherzadeh administered two urine tests and implemented a fingerprint test on Recruit 2 and told Recruit 2 that he had submitted the fingerprints to the FBI for review.

13.     In or around May 2021, as part of the recruitment process, ALI provided Recruit 2

4

with information and fee requirements for a shooting certification course. In furtherance of the recruitment efforts, ALI took Recruit 2 to a firearms range in Upper Marlboro, Maryland to shoot a qualification course and receive a certificate.

14. In or around June 2021, Taherzadeh told Recruit 2 that a local fingerprint scan was required at MPD and that he had scheduled an appointment for Recruit 2 to get the scan on June 28, 2021. Recruit 2 went to MPD headquarters in Judiciary Square on the designated day but was turned away because he/she was told that he/she did not have an appointment. Taherzadeh then provided Recruit 2 with a second date and time to be fingerprinted at MPD, but when he arrived he was denied a second time. After these two failed attempts, in order to facilitate the recruitment process, in or about July 2021, ALI accompanied Recruit 2 and Recruit 4 to MPD to get them fingerprinted.

15. While in Taherzadeh's apartment, in the presence of Recruit 2, using live firearms, ALI and Taherzadeh conducted weapons handling drills, including disarming an armed subject, "tap and racks" involving loading and clearing the weapon, and holstering and unholstering of the sidearm.

16. In or around July 2021, Taherzadeh represented to Recruit 3 that he was a Special Agent with HSI and that that ALI was also affiliated with HSI.

17. In or around mid-September 2021, Taherzadeh "recruited" Recruit 3 to serve as an employee of HSI. As a result of Taherzadeh's representation that he was an employee of HSI, Recruit 3 agreed to pursue DHS/HSI employment through him. Taherzadeh represented that he had started the process of hiring Recruit 3 as an employee of DHS/HSI and that he also had authority to "deputize" individuals as employees of DHS/HSI.

18. During a discussion of roles in HSI, with ALI and Taherzadeh, they told Recruit 3 that he would have to carry a firearm for certain jobs. At that point, ALI and Taherzadeh showed Recruit 3 that they were carrying handguns.

### *Fraud Committed Against the Crossing Apartment Complex*

19. The Crossing is a luxury apartment complex located at 949 First Street SE in the District of Columbia.

20. ALI conspired with Taherzadeh to use their assumed law enforcement personas and the entity USSP to maintain leases for multiple apartments in the Crossing apartment complex. Taherzadeh used USSP, an entity that appeared to be part of the federal government, because he was aware that he did not have the personal credit or funds to obtain an apartment in his own name.

21. ALI and Taherzadeh lived at the Crossing apartment complex for an extended period of time and failed to pay rent and associated fees.

22. When confronted by management about their failure to pay rent and other fees, ALI and Taherzadeh would claim issues with USSP management and the general federal bureaucracy. On some occasions, ALI and Taherzadeh would use invented supervisors, "Kevin Fuller" or "Morgan Noble," who were represented to be the "Director" or "Special Agent in Charge (SAC)" of USSP, and, therefore, officials of the U.S. Government, to make requests or explain delays in payments. These false and fictitious personas were also created to make the USSP appear to be a legitimate organization, part of a larger government structure.

23. On or about November 20, 2020, USSP, Taherzadeh, and Subject 1, on behalf of USSP, using the name "Kevin Fuller," electronically executed two leases for apartments with monthly rents of approximately $5,285 for apartment 708, for the use of Taherzadeh, and $5,275

for apartment 608, for the use of Subject 1, at The Crossing, in Washington, D.C.

24. On or about December 30, 2020, USSP, Taherzadeh, and Subject 1, on behalf of USSP, using the name "Kevin Fuller," electronically executed a lease for an apartment with a monthly rent of approximately $2,354 for apartment 509 at The Crossing, in Washington, D.C.

25. On or about January 19, 2021, USSP, Taherzadeh, and Subject 1, on behalf of USSP, using the name "Kevin Fuller," electronically executed two leases for apartments with monthly rents of approximately $3,350 for Penthouse 5, and $4,020 for apartment 1361 at The Crossing, in Washington, D.C.

26. In or around January 2021, ALI began using and later moved into the apartment 608 and did not pay any rent or fees associated with this apartment during his tenancy.

27. Penthouse 5 at The Crossing was maintained and controlled by ALI and Taherzadeh and later used as USSP's phony office. Within Penthouse 5, ALI and Taherzadeh possessed, among other things: (1) a Glock 19 9mm handgun loaded with a large capacity ammunition feeding device, containing 17 rounds of ammunition, including one in the chamber, registered to ALI; (2) seven rounds of .308 caliber ammunition, and an ammunition box with over 35 rounds of handgun ammunition; (3) unlicensed long gun components including a firearm barrel, weapon stock attachments, foregrips, a magazine cartridge and scope; (4) electronics devices including a significant quantity of surveillance equipment, approximately 30 hard drives, hard drive copying equipment, a computer server containing six modules, a machine to create and program Personal Identification Verification (PIV) cards and blank cards with embedded chips, a currency counter, several Subscriber Identification Modules (SIM) cards and antennas; and (5) law enforcement tactical gear and storage equipment including clothing with police insignias, police parking

placards, a latent fingerprint kit, and equipment for breaching a door, including a sledgehammer, ram, Halligan tool, lock picking kit and axe.

28.    ALI and Taherzadeh used their false identification with law enforcement to obtain access to security footage in The Crossing building.

29.    ALI used his false identification with law enforcement to obtain a list of all the residents in the Crossing as well as their apartment number and contact information. This list was stored in Penthouse 5.

30.    ALI and Taherzadeh also used their assumed personas to obtain or retain five (5) parking garage spaces.

31.    ALI represented to Witness 1 (the manager of the parking garage located at The Crossing) that he was on a special assignment with the Secret Service. ALI told Witness 1 that all of the vehicles were for official federal business. Each time a new vehicle or driver was added, ALI told Witness 1 that the new driver or vehicle was part of the USSP and part of the team. When asked by Witness 1 if the parking spots would be paid through a General Services Administration contract, ALI told Witness 1 that "everything would be taken care of."

32.    ALI and Taherzadeh used these parking spots for their personal vehicles, some of which were equipped to appear as law enforcement vehicles. ALI and Taherzadeh also provided access to these spots to members of the USSS for their personal use. After Subject 1 left, ALI was the primary point of contact between One Parking, the parking garage operators, and USSP.

33.    While the garage was under repair, One Parking provided the residents with valet parking to accommodate the inconvenience. ALI stated that he had weapons in his vehicles and could not have his vehicles driven by anyone else or parked on the street. As a result, Witness 1

8

allowed ALI's vehicles to be parked in the loading dock because he believed they were federal law enforcement vehicles with special equipment inside.

34. At another point, ALI came into the garage and asked for tools to remove a parking boot. A guest of a resident had their vehicle booted and ALI stated he was authorized to remove the boot.

35. On April 6, 2021, an employee of The Crossing sent an email to ALI and Taherzadeh at the USSP email address informing them that they owed approximately $50,978.77 in unpaid rent. Soon after, Taherzadeh falsely responded from the USSP email address and said that a check had been processed and sent by USSP.

36. By May 2021, USSP's parking bill had not been paid and there was a balance of approximately $7,854.50. Witness 1 repeatedly reached out to ALI regarding the outstanding balance. ALI always responded that he was extremely busy with his federal law enforcement responsibilities and investigations. ALI requested that the parking transponder -necessary to get in and out of the garage - not be discontinued because he needed his vehicles for his investigation.

37. On or about May 24, 2021, in response to an email indicating that parking permits would be canceled due to the unpaid balance, ALI, using his USSP email account, sent Witness 1 an email stating "I understand that there's a pending balance to the main USSP account. I have notified USSP AP department that were paying amount for June which will get reimbursed directly and previous balance needs to be paid directly to One Parking." ALI's representations were false and fraudulent as he was aware that there was no USSP Accounts Payable Department. The email was sent under false pretenses and in furtherance of the fraud.

38. On or about May 31, 2021, ALI was contacted Witness 1 in a three-way call with

9

"Kevin Fuller," who ALI introduced to be his direct supervisor at United States Special Police, but was, in truth and fact, Taherzadeh. Taherzadeh assured Witness 1 that the payment for parking would soon be arriving. USSP never paid for the parking.

39.   Throughout their tenancy, USSP, ALI, Taherzadeh and Subject 1, failed to pay any rent on the leased apartments. As of June 22, 2022, this resulted in a loss of to The Crossing of $306,879.37 and a loss to One Parking of $7,854.50.

### *Relationship with Secret Service Personnel Predicated on False Pretenses*

40.   Beginning as early as Spring 2020, Taherzadeh and Subject 1 began falsely and fraudulently identifying themselves as federal agents, specifically DHS Special Agents, to employees of the USSS. For instance, Taherzadeh falsely represented himself to USSS Employees 2 and 3, Uniformed Division officers, that he was an HSI Agent and that he was currently in a gang unit. Taherzadeh also falsely told USSS Employee 2 that he had previously investigated crimes against children. Similarly, Taherzadeh falsely represented himself to USSS Employee 1, a Special Agent with the USSS, that he was an HSI Agent and that ALI was an HSI Analyst. Taherzadeh further claimed that he was part of a covert task force.

41.   ALI and Taherzadeh attempted to and did ingratiate themselves with employees of the USSS because it provided them with cover and furthered their impersonation as a Federal Law Enforcement Officer.

42.   In furtherance of their efforts to ingratiate themselves with members of law enforcement, ALI and Taherzadeh also provided members of law enforcement with tangible and intangible items of value. For instance, Taherzadeh provided USSS Employee 1's wife with use of what he represented to be a "government vehicle." Taherzadeh provided USSS Employee 1

10

and his wife with a generator, a doomsday/survival backpack and offered to purchase and provide USSS Employee 1, a Special Agent assigned to the protective detail of the First Lady of the United States, with an AR-15 style rifle, valued at approximately $2,000.

43.     Taherzadeh provided USSS Employee 2 with a rent-free penthouse apartment for approximately one year, worth approximately $40,200 as well as an iPhone, a HSI coin, and a DHS patch. ALI helped facilitate USSS Employee 2's move into the apartment.

44.     Taherzadeh provided USSS Employee 3 with a rent-free apartment for approximately one year, with an estimated yearly rent of $48,240 as well as an iPhone, a drone, a gun locker and a Pelican case. ALI helped facilitate USSS Employee 3's move into the apartment.

45.     These gifts were provided in the course of ALI's and Taherzadeh's friendship with USSS Employees 1, 2, and 3, and deepened their relationship.

### *Representations to Postal Inspector*

46.     On or about March 14, 2022, an incident occurred at the Crossing involving a resident and a mail carrier. Following the incident, the resident called the MPD, who responded to the scene. At that time, ALI, who was a friend of the resident, identified himself as an employee of DHS and offered to assist MPD in obtaining video surveillance from the incident. ALI's conversation and representation was recorded on an MPD body-worn camera.

47.     On or about March 16, 2022, ALI called a USPS Inspector regarding the prior incident. During the call, ALI falsely identified himself as "an investigator with USSP Special Investigation's Unit, part of DHS." When the Inspector referenced obtaining the video from the Crossing, ALI stated "I may be able to get the video from the apartment" and further falsely stated that "my director can authorize subpoenas" and that "we've gotten subpoenas for other things

11

before." When pressed as to what "things" they had obtained, ALI stated "issues here at the apartment." During the call, ALI falsely stated a second time that he worked for "USSP Special Investigations Unit... It's part of DHS." When confronted by the USPS Inspector, ALI falsely stated "I don't think you understand law enforcement in DC." ALI further falsely claimed that he worked with the graduates of FLETC and federal agents which he said were different than postal inspectors. When the USPS Inspector told him that he too was a federal agent and was a former USSS Special Agent, ALI "thanked him for his service" and, soon after, said that he needed to cut the interview short due to other obligations.

48. On or about March 21, 2022, USPS Inspectors conducted a follow-up interview with ALI. During the interview, ALI was asked why he previously falsely claimed that USSP was part of DHS. ALI responded that he was just "implying to the best of my own knowledge" and falsely claimed that USSP conducted investigations on behalf of DHS. ALI further falsely stated that "DHS sends many cases to USSP. I'm an investigator at USSP and get assigned some of those." ALI continued, falsely saying, "my work is don't ask, don't tell." ALI further falsely claimed that he used to hold a federal security clearance. When the USPS inspectors noted that, if ALI's cases were not classified, they could be discussed with other members of law enforcement, ALI claimed "from all the videos I've watched and everyone I've talked to, it's best not to talk about my cases... I'm just being honest from my perspective." When asked how ALI could obtain a subpoena, ALI stated that his supervisor, Taherzadeh, who was a HSI Special Agent, could request it.

49. On or about March 21, 2022, after a follow-up interview with ALI, the USPS Inspector received a text message, sent by ALI and Taherzadeh, from ALI's phone. The text stated,

12

among other things, "I am sorry. I got carried away and basically lied and I was trying to impressing [sic] a chick, just want to be honest with you! I was caught up in the moment and just wanted to feel like I was on the same level as you guys and I have realized my mistake, that's really stupid of me... I'm ashamed and embarrassed for my actions."

### *Bank Fraud Scheme*

50. From beginning as early as May 2017 and continuing through March 2021, ALI engaged in a bank fraud scheme, through means of false and fraudulent pretenses, to defraud federally insured financial institutions

51. In furtherance of his false and fraudulent conduct, ALI, did the following:

   a. Assisted individuals in opening bank accounts in the name of straw businesses and obtaining debit cards;

   b. Provided these individuals with cash to serve as an initial deposit and allow for subsequent debit card transactions;

   c. Engaged in false and fraudulent credit and debit card transactions through a point-of-sale terminal, a device for processing card payments at retail locations;

   d. Directed the proceeds of these false and fraudulent transactions to bank accounts maintained and controlled by ALI or third-party account holders assisted by ALI.

   e. Instructed the accounts holders on the "debit side" of the transaction to withdraw the initial deposit while the debits were still listed as "pending";

   f. Instructed account holders on the "receiving side" of the transaction to withdraw the illegal proceeds; and

   g. Used and did use a false and fraudulent affiliation with DHS and other government

agencies to pressure nominee account holders.

### *Relevant Entities*

52. HSA Holdings Inc., d/b/a US Limo World Inc., was a Washington, D.C. corporation, whose registered agent and beneficial owner was ALI.

53. VA Limo World, Inc. was a Virginia corporation.

54. MYA Wholesale Inc. was a New York corporation.

55. Hitech Hardware and Software, Inc. was a Virginia corporation.

56. SEEO Inc. was a Maryland corporation.

57. Almao Limo Service Inc. was a Maryland corporation.

### *Financial Institutions*

58. TD Bank, N.A. ("TD Bank"), PNC Financial Services Group, Inc. ("PNC Bank"), Capital One Financial Corporation ("Capital One"), Wells Fargo Bank, N.A. ("Wells Fargo"), JP Morgan Chase & Co. ("JPMC"), Bank of America Corporation ("Bank of America"), and BB&T Corporation ("BB&T"), were all financial institution within the meaning of 18 U.S.C. § 20. Their deposits were insured by the Federal Deposit Insurance Corporation.

### *Fraudulent Transactions*

59. From beginning as early as May 2017 and continuing through March 2021, in the District of Columbia and elsewhere, ALI participated in a scheme and artifice to defraud financial institutions and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of financial institutions by means of materially false and fraudulent pretenses, representations, and promises

60. In furtherance of this scheme, ALI, using bank accounts maintained and controlled

by himself and third parties, falsely and fraudulently executed and caused the execution of debit and credit card transactions, totaling in excess of $550,000 but less than $1,500,000.

61.     As a result of ALI's fraudulent scheme, he derived more than $1,000,000 in gross receipts from one or more financial institutions.

62.     For instance, between on or about May 8, 2017, and on or about December 19, 2019, using HSA Holdings Inc.'s d/b/a US Limo World Inc.'s, bank accounts at PNC Bank, Capital One, Bank of America, and Wells Fargo, ALI falsely and fraudulently executed debit and credit card transactions totaling in excess of $550,000 but less than $1,500,000.

63.     On or about November 19, 2018, using SEEO Inc.'s bank account at TD Bank, ALI falsely and fraudulently executed debit and credit card transactions totaling approximately $22,992.20.

64.     Between on or about February 4, 2019, and on or about September 11, 2019, using MYA Wholesale Inc.'s bank account at Wells Fargo, ALI falsely and fraudulently executed debit and credit card transactions totaling approximately $15,218.05.

65.     Between on or about May 13, 2019, and on or about June 7, 2019, using VA Limo World, Inc.'s bank account at Wells Fargo, ALI falsely and fraudulently executed debit and credit transactions totaling approximately $32,911.50.

66.     On or about September 2, 2019, and September 3, 2019, $48,300 was deposited into JPMC account numbers x8786, x8802, and x8810, collectively held in the name of Alamo Limo Service Inc. Two of those deposits, totaling $18,800, were made at ATMs in the District of Columbia.

67.     Between on or about September 2, 2019, and September 6, 2019, $54,890 in debit

card purchases were made against the above-referenced JPMC accounts. ALI knowingly executed and attempted to execute the above-described scheme by causing three such debit card purchases, totaling $24,216, on a point-of-sale terminal held in the name of HSA Holdings Inc., d/b/a US Limo World in the District of Columbia.

68. On or about September 6, 2019, $41,705 in withdrawals were made from the above-referenced JPMC accounts prior to the debit card purchases clearing. At least one of those withdrawals, for $1,000, was made at an ATM in the District of Columbia.

69. As a result of the transactions set forth in Paragraphs 66, 67, and 68, JPMC suffered a loss of $48,535.94 and closed the above-referenced JPMC accounts.

70. On or about September 10, 2019, using Hitech Hardware and Software, Inc.'s bank account at Wells Fargo, ALI falsely and fraudulently executed debit and credit card transactions totaling approximately $7,251.83.

71. In furtherance, of the fraud scheme, ALI represented himself as a member of federal law enforcement to individuals that he assisted in opening straw bank accounts and retrieving the illegal proceeds. ALI would wear gear and clothing indicating that he was a law enforcement officer. ALI touted his law enforcement credentials to pressure those he involved in the scheme and also claimed that he could use his law enforcement connections to further the scheme. In furtherance of his impersonation as a federal law enforcement officer, ALI would wear law enforcement attire and equipment, including carrying a firearm consistent with the type of firearm

used by federal law enforcement.

                            Respectfully Submitted,

                            MATTHEW M. GRAVES
                            UNITED STATES ATTORNEY

By:   /s/Joshua S. Rothstein
       Elizabeth Aloi
       Joshua S. Rothstein
       Assistant United States Attorneys
       N.Y. Bar Number 4453759 (Rothstein)
       D.C. Bar Number 1015864 (Aloi)
       601 D Street, N.W., Fifth Floor
       Washington, D.C. 20530
       Office: 202-252-7164 (Rothstein)
       Joshua.Rothstein@usdoj.gov

## DEFENDANT'S ACCEPTANCE

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged.

I have read every word of this Statement of Offense. Pursuant to Fed. R. Cr. P. 11, after consulting with my attorney, I agree and stipulate to this Statement of Offense, and declare under penalty of perjury that it is true and correct.

Date: 10/4/2022

Haider Ali
Defendant

I have discussed this Statement of Offense with my client, HAIDER ALI. I concur with her decision to stipulate to this Statement of Offense.

Date: 10/4/2022

Greg Smith
Attorney for the Defendant

18

## General Conspiracy Charge
## 18 U.S.C. § 371

1. An agreement existed between two or more people to commit a crime;

2. The Defendant intentionally joined the agreement; and

3. The Government must prove that one of the people involved in the conspiracy did something for the purpose of carrying out the conspiracy.

## Bank Fraud
## 18 U.S.C. § 1344

1. The Defendant knowingly carried out or attempted to carry out a scheme to defraud a financial institution by using false or fraudulent pretenses, representations, or promises about a material fact;

2. The false or fraudulent pretenses, representations, or promises were material;

3. The Defendant intended to defraud the financial institution; and

4. The financial institution was federally insured or chartered.

## Unlawful Possession of a High Capacity Ammunition Feeding Device
## 7 D.C. Code § 2506.01

1. The Defendant possessed a large capacity ammunition feeding device; and

2. The Defendant did so voluntarily and on purpose, and not by mistake or accident.

   The term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition.