THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v.  : | Crim No.: 22-cr-133 (CKK) |
| HAIDER ALI, : | |
| Defendant. : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

For years, the Defendant, Haider Ali, pretended to be an officer of the United States government. Together with his coconspirators, the Defendant used this false identity to defraud Washington, D.C. apartment complexes; ingratiate himself with members of federal law enforcement; and commit bank fraud. In addition, the Defendant and his coconspirators stored a cache of weapons, ammunition, and surveillance equipment in their apartments – for which they had no legitimate or lawful purpose. He has pleaded guilty to conspiracy (Count One), bank fraud (Count Two), and Unlawful Possession of a Large Capacity Ammunition Device (Count Three). For his dangerous and dishonest conduct, the Court should adopt the parties' joint recommendation and impose a United States Sentencing Guidelines compliant sentence of between 63- and 78-months' incarceration and a fine of up to $300,000 for Counts One and Two, and 12-months' incarceration for Count Three.

I. **Procedural Background**

On April 19, 2022, a federal grand jury in the District of Columbia returned a three-count Indictment charging the Defendant and coconspirator Arian Taherzadeh with False Impersonation

1

of an Officer or Employee of the United States, in violation of 18 U.S.C. § 912 (Count One), and Unlawful Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 D.C. Code § 2506.01(b) (Count Two). (ECF No. 27). Taherzadeh was also charged with an additional count of Unlawful Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 D.C. Code § 2506.01(b) (Count Three).

On September 29, 2022, the United States Attorney filed a Superseding Information charging the Defendant with Conspiracy, in violation of 18 U.S.C. § 371 (Count One); Bank Fraud, in violation of 18 U.S.C. § 1344(2) (Count Two); and Unlawful Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 D.C. Code § 2506-01(b) (Count Three). (ECF No. 59). On October 5, 2022, the Defendant pleaded guilty to the Superseding Information after entering into a plea agreement with the United States. Codefendant Taherzadeh pleaded guilty to related charges on August 1, 2022. (ECF Nos. 62 and 63).

## II.   The Defendant's Criminal Schemes

As early as June 2020, the Defendant, together with his co-conspirators, started impersonating officers or employees of the United States government, specifically the Department of Homeland Security (DHS), the Department of Justice (DOJ), the Office of Personnel Management (OPM), other federal departments and agencies. They used their fraudulent identities to defraud apartment complexes, (including The Crossing, a luxury Apartment complex in the District of Columbia); ingratiate themselves with members of federal law enforcement and the defense community; and commit bank fraud.

### a.   *The Conspirators Use USSP to Impersonate Homeland Security Agents*

United States Special Police LLC (USSP) was a Washington, D.C., limited liability

company, with a registered address associated with a residence maintained and controlled by Taherzadeh at least as early as Spring 2020.  The Defendant helped fund USSP and pay for its expenses starting in January 2021.  On USSP's website, USSP was described as a private law enforcement, investigative, and protective service headquartered in Washington, D.C.  The website stated that USSP can provide law enforcement, protective services, and investigative services within a contracted jurisdiction. For years, the Defendant and Taherzadeh represented themselves as officers of the United States Government, through their affiliation with USSP even though USSP was not associated or affiliated in any way with the United States Government, nor had it ever done business with the United States Government.  PSR at ¶ 15.  On several occasions, the Defendant and Taherzadeh sought to recruit individuals to join their USSP "task force" or "unit," which these individuals believed to be part of DHS and federal law enforcement.  The Defendant and Taherzadeh's impersonation of federal law enforcement was a critical and necessary component of the "recruitment process."   One such individual was N.H.K.

In February or March of 2021, Taherzadeh falsely told N.H.K. he was Special Agent with Homeland Security Investigations (HSI).  At the same time, the Defendant falsely represented to N.H.K. himself to be a federal official of the Office of Personnel Management (OPM) with investigative authority.  In May 2021, Taherzadeh asked N.H.K. to be "deputized" through the Metropolitan Police Department (MPD) as a Special Police Officer, which Taherzadeh claimed would allow N.H.K. to assist the Defendant and Taherzadeh in HSI operations.  Taherzadeh instructed N.H.K. fill out a detailed application with MPD, which was notarized under false pretenses.  In addition, Taherzadeh administered two urine tests, fingerprinted N.H.K. and told N.H.K. that he had submitted the fingerprints to the Federal Bureau of Investigation (FBI) for

3

review.

In May 2021, as part of the "recruitment" process, the Defendant provided N.H.K. with information and fee requirements for a shooting certification course. The Defendant took N.H.K. to a firearms range in Maryland to shoot a qualification course and receive a certificate. The next month, Taherzadeh told N.H.K. that a local fingerprint scan was required at MPD and that he had scheduled an appointment for N.H.K. to get the scan on June 28, 2021. N.H.K. went to MPD headquarters in Judiciary Square on the designated day but was turned away because he/she was told that he/she did not have an appointment. Taherzadeh then provided N.H.K. with a second date and time to be fingerprinted at MPD, but when he/she arrived, he/she was denied a second time. After these two failed attempts, in order to facilitate the recruitment process, in or about July 2021, the Defendant accompanied N.H.K. to MPD to get him fingerprinted.

### b. *Fraud Committed Against the Crossing Apartment Complex*

The Crossing is a luxury apartment complex located in Southeast Washington, D.C. The Defendant conspired with Taherzadeh to use their assumed law enforcement personas and the entity USSP to maintain leases for multiple apartments in the Crossing apartment complex. The coconspirators used USSP, an entity that appeared to be part of the federal government, because they did not have the personal credit or funds to obtain an apartment in their own names

The Defendant and Taherzadeh lived at The Crossing apartment complex for an extended period of time and failed to pay rent and associated fees. When confronted by management about their failure to pay rent and other fees, the conspirators would claim issues with USSP management and the general federal bureaucracy. On some occasions, they would use invented supervisors, "Kevin Fuller" or "Morgan Noble," who were represented to be the "Director" or "Special Agent

4

in Charge (SAC)" of USSP, and, therefore, officials of the U.S. Government, to make requests or explain delays in payments.  These false and fictitious personas were also created to make the USSP appear to be a legitimate organization, part of a larger government structure.   As of June 22, 2022, the conspirators' conduct resulted in a loss of to The Crossing of $306,879.37 and a loss of $7,854.50 to the manager of the building's parking garage.

Penthouse 5 at The Crossing was maintained and controlled by the Defendant and Taherzadeh and later used as USSP's phony office.  Within Penthouse 5, the Defendant and Taherzadeh possessed, among other things: (1) a Glock 19 9mm handgun loaded with a large capacity ammunition feeding device, containing 17 rounds of ammunition, including one in the chamber, registered to the Defendant; (2) seven rounds of .308 caliber ammunition, and an ammunition box with over 35 rounds of handgun ammunition; (3) unlicensed long gun components including a firearm barrel, weapon stock attachments, foregrips, a magazine cartridge and scope; (4) electronics devices including a significant quantity of surveillance equipment, approximately 30 hard drives, hard drive copying equipment, a computer server containing six modules, a machine to create and program Personal Identification Verification (PIV) cards and blank cards with embedded chips, a currency counter, several Subscriber Identification Modules (SIM) cards and antennas; and (5) law enforcement tactical gear and storage equipment including clothing with police insignias, police parking placards, a latent fingerprint kit, and equipment for breaching a door, including a sledgehammer, ram, Halligan tool, lock picking kit and axe.

.  The Defendant and Taherzadeh also used their false law enforcement personas to gain access to security footage in the building as well as the apartment numbers and contact information for all of the residents.

The conspirators' misrepresentations related to The Crossing included lying to law enforcement.  On March 14, 2022, an incident occurred at the Crossing involving a resident and a mail carrier.  Following the incident, the resident called MPD, who responded to the scene.  At that time, the Defendant, who was a friend of the resident, identified himself as an employee of DHS and offered to assist MPD in obtaining video surveillance from the incident.

Two days later, on March 16, 2022, the Defendant called a United States Postal Service (USPS) Inspector regarding the March 14 incident.  During the call, the Defendant falsely identified himself as "an investigator with USSP Special Investigation's Unit, part of DHS."  When the Inspector referenced obtaining the video from the Crossing, the Defendant stated "I may be able to get the video from the apartment" and further falsely stated that "my director can authorize subpoenas" and that "we've gotten subpoenas for other things before."  When pressed as to what "things" they had obtained, the Defendant stated "issues here at the apartment."

When confronted by the USPS Inspector, the Defendant falsely stated "I don't think you understand law enforcement in D.C."  The Defendant further falsely claimed that he worked with the graduates of FLETC [the Federal Law Enforcement Training Center] and federal agents which he said were different than postal inspectors.  When the USPS Inspector told him that he too was a federal agent and was a former USSS Special Agent, the Defendant "thanked him for his service" and, soon after, said that he needed to cut the interview short due to other obligations.

Several days later, on March 21, 2022, USPS Inspectors conducted a follow-up interview with the Defendant.  During the interview, the Defendant was asked why he previously falsely claimed that USSP was part of DHS.  The Defendant responded that he was just "implying to the best of my own knowledge" and falsely claimed that USSP conducted investigations on behalf of

6

DHS. The Defendant further falsely stated that "DHS sends many cases to USSP. I'm an investigator at USSP and get assigned some of those." The Defendant continued, falsely saying, "my work is don't ask, don't tell." The Defendant further falsely claimed that he used to hold a federal security clearance. When the USPS inspectors noted that, if the Defendant's cases were not classified, they could be discussed with other members of law enforcement, the Defendant claimed "from all the videos I've watched and everyone I've talked to, it's best not to talk about my cases… I'm just being honest from my perspective." When asked how the Defendant could obtain a subpoena, the Defendant falsely stated that his supervisor, Taherzadeh, who was a HSI Special Agent, could request it.

After this follow-up interview with the Defendant, the USPS Inspector received a text message, sent by the Defendant and Taherzadeh, from the Defendant's phone. The text stated, among other things, "I am sorry. I got carried away and basically lied and I was trying to impressing [sic] a chick, just want to be honest with you! I was caught up in the moment and just wanted to feel like I was on the same level as you guys and I have realized my mistake, that's really stupid of me… I'm ashamed and embarrassed for my actions."

### c. *Relationship with Secret Service Personnel Predicated on False Pretenses*

Beginning as early as Spring 2020, the Defendant and his coconspirators began to ingratiate themselves with employees of the USSS because it helped to further their impersonation law enforcement officers. PSR at ¶ 32. For instance, the Defendant and Taherzadeh offered two Secret Service employees rent-free use of apartments at the Crossing for over a year. Taherzadeh also provided a secret service agent's wife with use of what he falsely represented to be a "government vehicle." Taherzadeh also provided this agent and his wife with a generator, a doomsday/survival

7

backpack and offered to purchase them an AR-15 style rifle, valued at approximately $2,000.

### d. The Defendant's Bank Fraud

From May 2017 through March 2021, the Defendant engaged in a scheme to defraud federally insured financial institutions. It was executed as follows: First, the Defendant helped individuals to open bank accounts in the name of straw businesses and to obtain debit cards. Then, he provided these individuals with cash to serve as an initial deposit and allow for subsequent debit card transactions. He would then engage in false credit and debit card transactions using those cards through a point-of-sale terminal, a device for processing card payments. Next, he would direct the proceeds of fraudulent transactions to bank accounts maintained and controlled by the Defendant or third-party account holders assisted by the Defendant. He would instruct (1) the accounts holders on the "debit side" of the transaction to withdraw the initial deposit while the debits were still listed as "pending"; and (2) the account holders on the "receiving side" of the transaction to withdraw the illegal proceeds.

In furtherance, of the fraud scheme, the Defendant represented himself as a member of federal law enforcement to individuals that he assisted in opening straw bank accounts and retrieving the illegal proceeds. He touted his law enforcement credentials to pressure the participation of others in the scheme. He would also wear gear and clothing indicating that he was a law enforcement officer.

In sum, the Defendant, using bank accounts maintained and controlled by himself and third parties, caused the execution of debit and credit card transactions, totaling in excess of $550,000 but less than $1,500,000. And, as a result of the Defendant's fraud, he derived more than $1,000,000 in gross receipts from one or more financial institutions.

### III. The Applicable Sentencing Guidelines

The parties agree that the following Sentencing Guidelines apply for Counts One and Two (PSR at ¶¶ 60-66, 68):

**Conspiracy**
Base Offense Level (§§ 2X1.1(a), 2B1.1):  6
Loss (§ 2B1.1(b)(1)(G)): +12
Misrepresentations re Government Agency (§ 2B1.1(b)(9)): +2
Offense involved possession of a firearm (§ 2B1.1(b)(16)): +2
Total Offense Level for Conspiracy Count: 22

**Bank Fraud**
Base Offense Level (§ 2B1.1): 7
Loss ((§ 2B1.1(b)(1)(I)) (More than $550,000):  +14
Sophisticated means ((§ 2B1.1(b)(10)): +2
Offense involved possession of a firearm (§ 2B1.1(b)(16)): +2
Loss to a Financial Institution in excess of $1,000,000 (§ 2B1.1(b)(17)): +2
Misrepresentations re Government Agency (§ 2B1.1(b)(9)): +2
Total Offense Level for Bank Fraud Count: 29

Counts Group under § 3D1.2(d) (Aggregate harm)
Loss ($314,733.87 + an amount in excess of $550,000 but less than $1,500,000): +14
Total Offense Level (§ 3D1.3(b)):  29

The Government agrees that a 2-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1, because the Defendant has demonstrated acceptance of responsibility. PSR at ¶ 71. The Government agrees that an additional 1-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1(b), because the Defendant provided timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. *Id.* at ¶ 72. In accordance with the above, the Estimated Offense Level should be 26, which establishes an estimated Guideline imprisonment range of 63 to 78 months and a fine rage of $30,000 to 300,000. The probation office has proposed a role adjustment for leader/organizer under U.S.S.G. § 3B1.1(c). PSR at ¶ 67. The Government did not seek the role

adjustment in the context of plea negotiations, given the Government's understanding of the Defendant's role in the conspiracy at the time of the plea.  *See* ECF No. 63 at ¶ 4A).

The parties also agree that under the D.C. Voluntary Sentencing Guidelines, Unlawful Possession of a Large Capacity Ammunition Feeding Device in violation of 7 D.C. Code 2506.01(b), is in Offense Severity Group M 9.  PSR at ¶ 74-75. Based on this offense severity group, sentencing range under the D.C. Voluntary Sentencing Guidelines for Unlawful Possession of a Large Capacity Ammunition Feeding Device is 0-12 months.  *Id.*

### IV. A Sentencing Within the Guidelines Range Appropriately Balances the 18 U.S.C. § 3553(a) Factors

To determine an appropriate sentence for Counts One and Two, the Court must first accurately calculate the Defendant's advisory Guidelines range.  "The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id*. at 101.

After calculating the correct Guidelines range, the Court should consider the various factors set forth in 18 U.S.C. § 3553(a).  *Gall v. United States*, 552 U.S. 38, 49-50 (2007).  These factors

include the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to promote respect for the law, just punishment, and adequate deterrence. 18 U.S.C. § 3553(a). The United States submits that considering these factors, a guidelines sentence at Offense Level 26 (Zone D, 63 to 78 months' incarceration) is appropriate and not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2), as it relates to Counts One and Two. The United States also submits that a fine within the applicable guidelines range of $3,000 to $30,000 is appropriate.

*First*, the nature and circumstances of the offense support a significant sentence. The Defendant's conduct was sophisticated, and his schemes continue for many years. His false association with law enforcement coupled with his improper relationship with the Secret Service, had the potential to do significant harm, including to our nation's security.

*Second,* the history and characteristics of the Defendant also support a significant sentence. Nothing about the Defendant's background as detailed in the presentence report excuses his behavior. He appears to have been afforded ample personal and professional opportunities throughout his life.

*Third*, Defendant's sentence must also reflect the seriousness of the offense to promote the rule of law, to provide just punishment, and to provide adequate deterrence, as well as to protect the public from future crimes of the defendant. Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). The Defendant by the nature of his crime impersonating law enforcement, has shown an utter disregard for the rule of law. As with the

11

nature and circumstances of the offense, and the history and characteristics of the defendant, this factor supports a lengthy sentence of incarceration.

V. **Conclusion**

For years, the Defendant, pretended to be a law enforcement officer, and then used this fake identification to commit fraud. For this dangerous and fraudulent conduct, the Court should impose a Sentencing Guidelines compliant sentence of between 63- and 78-months' incarceration and a fine of up to $300,000 for Counts One and Two-, and 12-months' incarceration for Count Three.

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: <u>/s/</u>
Elizabeth Aloi
Joshua S. Rothstein
Assistant United States Attorneys
N.Y. Bar Number 4453759 (Rothstein)
D.C. Bar Number 1015864 (Aloi)
601 D Street, N.W., Fifth Floor
Washington, D.C. 20530
Office: 202-252-7164 (Rothstein)
Joshua.Rothstein@usdoj.gov