**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Criminal No. 22 - 133 - 02 (CKK)** |
| | : | **Sentencing: August 7, 2023** |
| | : | |
| **HAIDER ALI** | : | |
| _____ | : | |

**DEFENDANT'S  MEMORANDUM IN AID OF SENTENCING**

**INTRODUCTION AND SENTENCING RECOMMENDATION:**

This matter is before the Court for sentencing based on the defendant's plea to a three count superseding criminal Information charging him with: 1)  conspiracy to commit fraud in violation of 18 U.S.C. §§ 371 and 912; 2) bank fraud in violation of 18 U.S.C. § 1344(2); and 3) possession of a large capacity ammunition feeding device in violation of 7 D.C. Code § 2506.01(b).  As part of the plea agreement, the parties recommended a range of 63 to 78 months. Defendant respectfully urges the Court to sentence him at the bottom of the range. In support of this request, Mr. Ali submits the following, along with a number of character letters on his behalf:

Mr. Ali was born and raised in Pakistan, and moved to the United States when he was fourteen years old, and attended high school here, graduating in 2004.  He became a naturalized U.S. Citizen in 2009.  This is Mr. Ali's first criminal conviction.  Most of the conduct seems to stem from his decisions to associate with and trust individuals who were involved in fraudulent activity and appeared to take him under their wings.  Mr. Ali thought that these individuals would be able to expeditiously help him through some difficult times, and unfortunately he put on blinders and ignored obvious signs that he was inappropriately heading down the wrong path. First, he blindly turned over control of the limousine company he started, and then assisted that individual and his associates in the fraudulent activities to which he has pleaded guilty.  When

- 2 -

those cards crumbled, he learned that Mr. Taherzadeh, who he knew from a prior failed business relationship, was on social media holding himself out as a law enforcement officer, and and he again sought Mr. Taherzadeh's assistance in his effort to make a career change from the limousine business. [1]  Mr. Taherzadeh maintained that he was part of DHS, and agreed to offer Mr. Ali an opportunity to join his company.  Mr. Ali was led to believe that this would be a way for him to get the money that he had been owed from his prior involvement with Mr. Taherzadeh and his company, AET Holdings.  Even though Mr. Ali had lost money when he trusted Mr. Taherzadeh in the past, for some reason Mr. Ali again decided to trust him and join him working at USSP.  Unbeknownst to Mr. Ali at the time, for nearly two years Mr. Taherzadeh had been laying the foundation to falsely and fraudulently use USSP as a "government entity" to lease luxury apartments and to otherwise deceive the public.  Without hesitation, Mr. Ali jumped in and joined Mr. Taherzadeh at USSP until his arrest and prosecution in this case.

Significantly, Mr. Ali's arrest and prosecution has taught him a great deal about his lack of judgment, and his propensity for being overly trusting.  Over the past year, he has had a great deal of time to reflect his conduct and  poor judgment.  It has been enlightening, and he seems well on his way to re-setting his character, his judgment, and his moral compass in order to assure that he does not repeat past mistakes.

Mr. Ali has a close-knit extended family.  He is married and has been a very involved parent for his four young children between the ages of 1 and 6 years old).  Even as he has been

---

[1]  Significantly, in or about 2016, Mr. Ali met Mr. Taherzadeh and entered into an unsuccessful business relationship with him. At that time, Mr. Taherzadeh was operating AET Holdings, which he claimed was a very successful company.  Mr. Taherzadeh had a penthouse apartment, drove expensive vehicles, and otherwise gave the appearance of such success. Mr. Taherzadeh offered Mr. Ali a position with AET, and convinced to put some of his money into AET Holdings. Of course, Mr. Ali trusted Mr. Taherzadeh and jumped at the opportunity. However, like Mr. Taherzadeh's later endeavors, AET Holdings appeared to default on many of its obligations.  In or about 2017 and 2018, there were a number of civil suits filed against AET in the District of Columbia, including by Mercedes Benz.  Judgments were entered against AET in at least two of the cases, in amounts totaling more than $35,000.  Mr. Ali also lost a considerable amount of money as a result of his involvement with Mr. Taherzadeh at that time, and returned to his limousine business in debt.

working through his legal problems, he has had to provide a great deal of support to his wife and children, particularly in light of his son's behavioral issues and his wife's medical and personal issues. [*See*, PSR ¶ 96]  Since his arrest in this case, Mr. Ali and his family have been living with Mr. Ali's parents.  He is a very devoted family man - both to his immediate family and extended family.  His strong family support and stability will greatly assist with him with his continuing efforts to get back on track and become a law-abiding productive member of the community. [*See*, Character Letters].

Mr. Ali has now been on court supervision for more than 15 months under very strict home incarceration conditions.  During that time, he has been extremely compliant - maintaining regular contact with his PSA officer and obtaining pre-approval for the few activities that required him to leave his residence.  The assigned PSA Officer has repeatedly confirmed  Mr. Ali's high level of compliance and regard for the Court's conditions.  Accordingly, Mr. Ali has shown that he is extremely amenable to supervision; that he has the appropriate respect for the rules of the court; and that by his actions he demonstrates that he will be a low risk to re-offend when he completes the imprisonment portion of his sentence.

The parties have agreed to recommend a sentencing range of 63 to 78 months. Counsel submits that the totality of the sentencing factors supports a sentence at the bottom of the recommended range, particularly since BOP policies and guidelines will prevent Mr. Ali from getting any BOP credit for the lengthy period of time he has been on home incarceration conditions - conditions that in many ways are tantamount to "house arrest" or official detention. Thus, taking the home incarceration time into account in fashioning an appropriate prison sentence, counsel submits that the bottom of the range is sufficient, but not greater than necessary, to satisfy the goals of sentencing under the totality of circumstances in his case.

– 4 –

I.      **PROCEDURAL BACKGROUND:**

In or about March 2022, a United States Postal Inspector was investigating an alleged assault involving a postal carrier in or about the Crossings Apartment complex in the District of Columbia.  During the course of the investigation, the Inspector learned that Arian Taherzadeh and Haider Ali were utilizing apartments in the complex, and had been identifying themselves as investigators with the U.S. Special Police (USSP), which they characterized as part of the Department of Homeland Security (DHS).  Witnesses reported that Mr. Taherzadeh provided gifts and the use of apartments to United States Secret Service Agents living in the building.  The Postal Inspector's information was provided to the F.B.I. which then began its investigation.  The F.B.I. interviewed a number of witnesses. Based on that investigation, on or about April 5, 2022, a Criminal Complaint was filed in the United States District Court for the District of Columbia, charging defendants Arian Taherzadeh and Haider Ali with False Impersonation of a Federal Officer in violation of 18 U.S.C. § 912,and arrest warrants were obtained for the defendants. [*See*, Complaint & Affidavit, Case No. 22-mj-076 (GMH), ECF 1-1]

On April 6, 2022, the defendants were arrested and presented before the Magistrate Judge.  The defendants were held pending a detention hearing.  Following Mr. Ali's detention hearing, he was released into the PSA - HISP program on home incarceration conditions, and a preliminary hearing was scheduled on April 27, 2022. However, prior to the preliminary hearing, a federal grand jury returned a three count Indictment, charging Mr. Taherzadeh and Mr. Ali with False Impersonation of a Federal Officer in violation of 18 U.S.C. § 912, and possession of a large capacity ammunition feeding device in violation of 7 D.C. Code § 2506.01(b). The Indictment also charged Mr. Taherzadeh separately with one count of possession of a large capacity ammunition feeding device in violation of 7 D.C. Code § 2506.01(b).

Following the indictment the government began providing discovery for the defendants to review. As part of the discovery, the government provided notice to Mr. Ali that he had been implicated in a separate bank fraud scheme, and that a global plea offer would be made that

– 5 –

would include the bank fraud matter as well.  In or about September, 2022, Mr. Ali reached a global plea agreement with the government, covering both the false impersonation of a federal officer and the bank fraud allegations. On or about October 05, 2022, Mr. Ali appeared before this Court and entered a guilty plea pursuant to the written plea agreement.  The matter was referred to the Probation Department for the preparation of a Pre-sentence Report.  The PSR was completed.  Sentencing is currently scheduled for August 7, 2023.  According to the Pretrial Services Agency, Mr. Ali has remained in compliance without incident throughout the pendency of the case.


## II.   FACTUAL BACKGROUND:

### A.   False Impersonation of a Federal Officer & Defendant's Role With The United States Special Police (USSP)

United States Special Police (USSP) is (or was) a limited liability company with a registered address associated with Mr. Taherzadeh. Mr. Taherzadeh and "Subject 1" (as referenced in the Indictment and plea documents) were involved in the creation and operation of the entity called United States Special Police ("USSP").  Records indicate that on or about March 8, 2019, Taherzadeh obtained a D.C. Certificate of Licensure for USSP to operate as a "Private Detective Business". [*See*, Exhibit 1] [2]  The records further indicate that in or about March 2019, Mr. Taherzadeh applied to the D.C. Department of Consumer and Regulatory Affairs ("DCRA") for an SPO license as an employee of USSP, but that application was not approved. [*See*, Exhibit 2] [3]  In or about November 2019, USSP was apparently also issued a D.C. Certificate of

---

[2]  Counsel is separately filing the exhibits under seal, at least initially, because counsel is not sure whether the documents are currently under a Protective Order and need to be under seal.

[3]  Notwithstanding the denial of the SPO license, the records also show an MPD SPO photo identification card in Taherzadeh's name and an SPO badge with an apparent expiration date of 02/01/2019.  [*See*, Exhibit 3] The records also revealed an image of an apparent  photo identification card in Taherzadeh's name, which purports to be a "USSP Special Agent - Special Investigations Unit" ID card with a photo of Taherzadeh, an issue date of 01/19/2018, and an expiration date of 05/31/2019. [*See*, Exhibit 4]

– 6 –

Licensure as a Security Agency business.  [*See*, Exhibit 5 ]

Moreover, as early as December 2018, nearly two years before Mr. Ali became involved with USSP, Mr. Taherzadeh and Subject 1 appear to have begun obtaining leases at luxury apartment complexes in the District of Columbia under false pretenses using the entity USSP, and using false and fictitious personas  - first at Sonnet apartments; then at Carver Apartments; and finally at the Crossing Apartments. It is clear that as early as December 2018, false and fictitious "officers" of USSP, including "Morgan Noble" and "Kevin Fuller", were being used by Mr. Taherzadeh (and possibly Subject 1) - apparently to both to legitimize USSP as a legitimate organization and later to explain delays in payments or otherwise hold off their inevitable evictions from the apartments they had rented.  Specifically, on or about December 10, 2018, Subject 1 submitted an application for three apartments at the Sonnet complex, and used "Morgan Noble's" name on the application. [4]  [*See*, Exhibit 6 ] [5]  After Sonnet, they used the same modus operandi in applying to rent apartments at Carver in USSP's name. Towards the end of 2019 and early 2020, Taherzadeh and Subject 1 obtained leases for three apartments at Carver under corporate accounts using the entity USSP - - one for Taherzadeh, one for Subject 1, and one as the Command Center.   The records suggest that they represented themselves as special agents, and again used "Morgan Noble" as the "SAC" (Special Agent in Charge) and / or Deputy Director. [*See*, Exhibits 7 - 8 ].  Again, Mr. Taherzadeh and Subject 1, not Mr. Ali, were the ones involved in obtaining these leases, and also were the ones responsible for non-payment of rent. In January 2020, they were already more than $17,000 in arrears, and were receiving e-mails looking for payment.  Mr. Taherzadeh (or Subject 1) responded as "accounts payable @ ussp", falsely telling the Carver officials that the payments were approved and disbursements would

---

[4]  It is counsel's understanding that they were required to leave Sonnet due to non-payment of rent, but counsel does not have further records relating to the leases at Sonnet.

[5]  Counsel is separately filing the exhibits under seal to give the parties time to determine whether any of the documents are currently under a Protective Order, and /or whether any need to be redacted.

follow soon.  [*See*, Exhibit 9]  By April eviction proceedings had begun, and in an effort to hold off the evictions Mr. Taherzadeh began corresponding with the Carver management and owners as "Kevin Fuller" the fictitious "Director" of USSP.  Mr.Taherzadeh made further fraudulent representations, suggesting that government bureaucracy was causing problems with the payments, and assuring Carver management that USSP's legal counsel would work to resolve the issues. [*See*, Exhibit 9]

       Mr. Taherzadeh stayed at Carver without paying rent until the end of 2020, and then somehow was able to utilize the same M.O.; fraudulently obtain leases at another luxury apartment building, the Crossing; and move the fraudulent USSP operation there.  Again, it was Taherzadeh (and Subject 1), not Mr. Ali, who negotiated and executed the leases for the apartments at Crossing - again under the corporate name USSP, representing that they were special agents.  Again, it was Taherzadeh and Subject 1, not Mr. Ali, who initially moved into the Crossing.  Mr. Ali did not move into the Crossing until a few months later when Subject 1 vacated his apartment.

       Significantly, while still at Carver, Mr. Taherzadeh befriended a number of federal agents, convincing them that USSP was a legitimate arm of the Department of Homeland Security (DHS) and that he was an investigator on a task force with HSI.  He provided gifts and favors for members of law enforcement, including the FBI, USSS, or DHS who lived in the building. [*See*, Affidavit & Complaint, Case No. 22-mj-076 (GMH), ECF 1-1, p. 7] Two of the federal (USSS) agents Taherzadeh befriended lived in Carver and moved to Crossing to live rent-free in USSP's apartments at Taherzadeh's suggestion. *Id.*  The law enforcement officers that were interviewed provided numerous examples of the Taherzadeh having DHS / HSI credentials and gear, federal training certificates, and secure government log-in access.  Mr. Taherzadeh offered two USSS agents apartments rent-free at Crossing in two of USSP's apartments, as well as other gifts. The agents accepted the offer and moved to the apartments at Crossing after the

– 8 –

USSP leases were obtained, as they apparently believed Taherzadeh's false and fraudulent representations.  Thus, long before Mr. Ali was in the picture, Mr. Taherzadeh created his fictitious DHS / HSI law enforcement persona; obtained or created the credentials he used to support his DHS / HSI story; and amassed the extraordinary amount of law enforcement equipment, cameras, monitors, and other gear which was maintained in the "command center" (unit 311) at Carver - which was eventually moved to Crossing. [*See*, Exhibit 9 @ US-12870]

In late 2020, Mr. Ali had become involved with Mr. Taherzadeh at USSP, and began applying for his SPO credentials. Within a couple months, Mr. Taherzadeh and Subject 1 were moving the USSP operation from the Carver apartments to the Crossing, and Mr. Ali was asked to assist Taherzadeh and the others with the move from Carver into the Crossing.  During this time, Mr. Ali met the USSS agents Taherzadeh had befriended, and saw how they interacted with Taherzadeh, thus bolstering Mr. Ali's belief at the time that Taherzadeh and USSP were legitimate businesses.  At that time Mr. Taherzadeh led Mr. Ali to believe that USSP was legitimate, and that the fictitious Deputy Director of USSP, "Kevin Fuller", was legitimate.  As late as May 2021, Mr. Taherzadeh continued the fiction, texting Mr. Ali as "Director Fuller", leading Mr. Ali to continue to believe that "Kevin Fuller" was a real person who was the Director of USSP. [6]  [*See*,  Exhibit 10]  It was not until much later, that Mr. Ali began to learn things about Taherzadeh, USSP, "Kevin Fuller", and the fraud.  Yet Mr. Ali remained loyal to Mr. Taherzadeh and continued to trust that Mr. Taherzadeh would make sure that everything would end up alright for them.

The Initial Complaint and Affidavit filed in the case seems to corroborate counsel's understanding of the vast disparity in the roles of Mr. Taherzadeh and Mr. Ali.  The witnesses

---

[6]  Counsel would also note that Mr. Taherzadeh, after his arrest, confirmed that he did not recall telling Mr. Ali that "Kevin Fuller" was a fictitious persona, although he believed that Mr. Ali learned that at some point.

– 9 –

mainly described the fraudulent actions of Taherzadeh, with little mention of Mr. Ali, other than that he was living there and also purported to be an investigator with USSP, which was part of DHS. [See, Affidavit & Complaint, Case No. 22-mj-076 (GMH), ECF 1-1 ]   As set forth in the Affidavit, the witnesses reported the following:

- Taherzadeh repeatedly represented that he was  a Special Agent with HSI / DHS

- Taherzadeh represented that Mr. Ali was affiliated with HSI as an anaylst

- Taherzadeh regularly carried a firearm concealed on his person

- Taherzadeh represented that he could "deputize" individuals as DHS/HSI employees

- Taherzadeh sent photos of himself in an "HSI" vest and law enforcement tactical gear

- Taherzadeh represented that he was working in an "undercover" unit; and that the special police officer position with USSP was a front for his HSI undercover work

- Taherzadeh had in his apartment "SWAT" vests, computers, high-powered telescope, and surveillance cameras and footage from the complex

- Taherzadeh provided apartments rent-free to two federal law enforcement officers

- Taherzadeh interacted with MPD officers wearing "HSI" gear

- Taherzadeh drove two black "Tahoe-like" vehicles and an Impala with police lights

- Taherzadeh had DHS patches, a handgun, a rifle, and an air rifle in his residence

- Taherzadeh represented that Mr. Ali took care of the administrative issues with his HSI task force

- Taherzadeh is the beneficial owner of United States Special Police, LLC (USSP), with a registered address associated with the residence controlled by Taherzadeh

Counsel would further note that the FBI executed search warrants and seized numerous items following the defendants' arrests.  The seizures included cell phones, computers and other electronic devices, hard drives, surveillance cameras.  The evidence confirmed much of the

information in the Complaint - showing that Mr. Taherzadeh and Mr. Ali were holding themselves out as investigators who were part of DHS.  However, again the bulk of the seized evidence and data recovered from the various devices pointed to Mr. Taherzadeh's longstanding efforts to lay the foundation for the fraudulent scheme beginning as early as 2019, as well as his actions impersonating a federal law enforcement officer which appeared to begin in or about 2019.  [*See*, Exhibit 11 ] [7]

As for Mr. Ali, the evidence demonstrated that he joined USSP in the latter part of 2020, long after Mr. Taherzadeh created and began fraudulently operating USSP and defrauding luxury apartment complexes.  Counsel would further note that for the most part Mr. Ali did what Mr. Taherzadeh directed him to do - often using their USSP texts or e-mail accounts. Probation is correct that Mr. Ali did accompany Mr. Taherzadeh's "recruits" to MPD for fingerprint processing, however, it seems uncontraverted that he did that at Mr. Taherzadeh's express request  because there had been two prior failed attempts by Mr. Taherzadeh and one of the recruits to complete the task, and Mr. Ali was familiar with the fingerprint process because he recently went through the process as a "recruit".  Simply put, Mr. Ali did what Mr.Taherzadeh asked him to do, and he was not an organizer, manager, leader, or supervisor of anyone at USSP.

### B.  Bank Fraud Scheme

Mr. Ali established a limousine company in 2009, and operated it until about 2018.  In or about 2016 and 2017, Mr. Ali's company was in financial trouble, in large part because of the monies he lost in his failed business venture with Mr. Taherzadeh and AET Holdings. As a

---

[7]  Counsel's review of the discovery revealed that the overwhelming majority of the discovery documents, photographs, videos, e-mails, text messages, and communications with the USSS agents living in the USSP apartments showed Mr. Taherzadeh's lengthy and extensive efforts to fraudulently create and operate USSP, with a relatively small portion involving Mr. Ali. Counsel is including a very small sampling of images regarding Mr. Taherzadeh in Exhibit 11.

- 11 -

result, he reached out to some older, more established businessmen in his community for some financial guidance.  He was introduced to some individuals who indicated that they could help him get a loan even though he had bad credit at the time.  Those efforts led him to other individual(s), who in late 2018 largely took over the financial control of his limousine company (HSA Holdings). [8]  Mr. Ali continued to remain active in the business, and the accounts remained in his name, but he gave up much of the financial responsibility to other individuals who assumed control of much of the company's financial dealings and accounts during that time. Soon, Mr. Ali learned that accounts were being used to improperly obtain monies from several banks using a "merchant-terminal" fraud scheme.  Much of the fraud activity occurred between November 2018 and September 2019 when the others were at the helm of the company.

Mr. Ali assisted the other individuals as requested - often  assisting individuals opening bank accounts in the name of straw businesses; obtaining debit cards to be used in the fraudulent "point-of-sale" terminals to complete the fraudulent transactions; and submitting bookkeeping records.  Even though Mr. Ali was not the mastermind of the scheme, because of his position at HSA Holdings, and the accounts were still in his name, he was involved in many of the transactions - which gives the appearance that he was the more culpable than he actually was. In fact, it appears that most of the merchant terminal transactions were conducted by other individuals.  Moreover, counsel would note that the proceeds had to be split among the participants, which much of the proceeds going to other individuals.  Thus, Mr. Ali's net proceeds were far less the gross amounts received during the scheme.

Finally, counsel would note that the Mr. Ali's relinquished of much of the control of HSA Holdings in 2018 and 2019 is corroborated by the fact that the HSA Holdings tax forms for 2019

---

[8]  For privacy reasons, a copy of the tax form filed by the new owner and president is being filed separately under seal as "Exhibit 11", along with the other sealed defense exhibits.

were filed by other individuals.  [*See*, Exhibit 12 ]  Mr. Ali trusted those individuals, hoping they would get the limousine business financially on track, but it did not work out that way.  Mr. Ali eventually decided to move away from the limousine business, but unfortunately for him, that led him to Mr. Taherzadeh and USSP, where Mr. Taherzadeh was already deeply involved in the USSP fraud scheme, and where his problems were sadly compounded.

### III.    PRE-SENTENCE REPORT AND ADVISORY SENTENCING GUIDELINES ISSUES

Defendant agrees with the government's calculations in their sentencing memorandum, and objects to Probation's calculation.  Under the plea agreement the parties agreed that total adjusted offense level for Counts one and two is 29, and after acceptance of responsibility the total offense level is 26.  The PSR, however, recommends a two level role adjustment for both Mr. Ali and Mr. Taherzadeh under USSG, 3B1.1(c), resulting in a total adjusted offense level of 31 for Mr. Ali as to Counts One and Two. [See. PSR ¶¶ 67 & 69]  After the three level reduction for acceptance of responsibility the PSR recommends a total offense level of 28.  [See. PSR ¶ 73] The criminal history score is zero resulting in Criminal History Category I.  [See. PSR ¶ 78]. Thus, under the calculation in the plea agreement the advisory guideline range 63 to 78 months, and the recommended guideline range in the PSR is 78 to 97 months [See. PSR ¶ 125]. Defendant maintains that Probation's calculation is not adequately supported by the evidence, and for the reasons discussed below requests that the Court direct that the role enhancement be deleted from PSR.  Count Three is a D.C. Code offense and the D.C. Voluntary guideline range is 0 to 12 months [See. PSR ¶ 129].  None of the offenses requires a mandatory minimum statutory prison sentence.

- 13 -

**A. Defendant's Objections:**

**1. Suggested Role Enhancement:**

¶ 50, 67, 69 :   Defendant objects to the proposed 2-level role enhancement and suggestion that Mr. Ali was also "an organizer, leader, manager, or supervisor in the criminal activity"; and Defendant requests that the PSR be changed to delete the proposed role enhancement.   Counsel submits that the recommended enhancement is not appropriate for Mr. Ali. It is worth noting that the government did not seek the enhancement.  More importantly, the PSR's rationale does not support a finding that Mr. Ali was an organizer, leader, manager, or supervisor.  In fact, the example used in the PSR more appropriately shows the limited role Mr. Ali played - performing ministerial tasks at the direction of Mr. Taherzadeh, who was the creator, organizer, leader, manager, and supervisor of the scheme. Mr. Ali was not managing the recruits when he accompanied them to MPD for fingerprint processing. He was expressly directed to accompany them by Mr. Taherzadeh after one of the recruits failed to complete the process the two times Mr. Taherzadeh scheduled the appointments. Therefore, since Mr. Ali was a recent recruit who had been through the process, Taherzadeh asked Mr. Ali to accompany the recruit. Mr. Ali's efforts do not reflect any managerial, supervisory, or leadership role.

Virtually everything Mr. Ali did during his association with USSP was at the direction of Mr. Taherzadeh - usually confirmed by text message or e-mail on the USSP devices provided by Taherzadeh. A review of the discovery shows the gross disparity between the efforts, involvement, leadership, and daily supervision by Mr. Taherzadeh (and Subject 1), which spanned a nearly two year period before Mr. Ali joined USSP in 2020.  Mr. Ali was a pawn of Mr. Taherzadeh, and had no managerial or supervisory duties, and no decision-making authority. That all came from Mr. Taherzadeh.  Mr. Ali was not close to being on a management level, and certainly not the same level as Mr. Taherzadeh - the person who amassed the gear, equipment,

- 14 -

offices, command centers, and knowledge for years before he took Mr. Ali under his wing.

In Probation's defense, they have not had access to the wealth of discovery showing the vast disparity regarding the evidence of Mr. Taherzadeh's creating USSP, organizing, leading, and managing USSP; using USSP to lease the many luxury apartments at Carver and the Crossing; offering rent-free apartments and gifts to USSS agents and other members of law enforcement; and corresponding with the USSS agents on a near daily basis to enhance his false persona as a DHS agent.  The evidence of Mr. Ali's involvement is scant compared to the images and evidence regarding Mr. Taherzadeh. Thus, counsel submits that the evidence falls far short of the type of control or supervision necessary for such a role enhancement for Mr. Ali, and that the PSR should be corrected, deleting the 2 level enhancement and correcting the applicable guideline range calculations.

### a.  Additional Requested PSR Modifications:

Several additional objections involve requested modifications to the summary of the offense conduct. In making the objections, counsel acknowledged that the summary was largely taken from the plea proffer, but counsel requested the modifications anyway in instances where counsel believes that the wording of the offense conduct was misleading as to Mr. Ali's involvement based on the discovery provided in the case. The following objections remain unresolved and Probation appears to have deferred to the Court:

¶ 14 : Defendant requests that the following language be deleted from the paragraph as the discovery clearly showed that it is incorrect or misleading: Mr. Ali conspired to "create the entity called United States Special Police (USSP)".   The discovery clearly establishes that Mr. Taherzadeh (possibly with Subject 1) created the entity in or about 2018, long before Mr. Ali had any association with USSP, and therefore Mr. Ali clearly had no part in "creating the entity".

[See, Sealed Exhibits 6 - 9 ]   Since Probation did not have the benefit of reviewing the discovery in the case, it correctly deferred to the Court. [See, PSR, p. 31]

¶ 16 :  Similarly, counsel requests that the paragraph include a statement clarifying that Mr. Taherzadeh played a direct part in initiating some of Mr. Ali's false claims - claims that Mr. Ali did not correct and continued to embrace. That is clear from the Affidavit in support of the Criminal Complaint. [See, See, Affidavit, Case No. 22-mj-076 (GMH), ECF 1-1, p. 6 ¶ 25] Again, Probation deferred to the Court.

¶ 21 : Similar to counsel's concerns in ¶ 14 above, the last sentence suggests that Mr. Ali had some role in creating the "fictitious personas".  Again, counsel sought to clarify that sentence in the paragraph. As discussed in more detail above, the discovery clearly establishes that the false and fictitious personas were created by Mr. Taherzadeh in or about 2018 and 2019 - again long before Mr. Ali had any association with Mr. Taherzadeh at USSP. Thus, counsel asked for a sentence clarifying that fact.

¶ 25 : This paragraph incorrectly states that Mr. Ali began using apartment 608 in January 2021, so counsel requested that it be corrected.  It is counsel's understanding that Subject 1 lived in apartment 608 until about March or April 2021, and that Mr. Ali moved into the apartment when Subject 1 left. Thus, counsel requests that clarification.

¶ 37 : Counsel objected to the last sentence, indicating that nominee account holders who participated in the bank fraud felt "pressured" by Mr. Ali's purported affiliation with DHS. Those allegations seemed to be misleading, at least as to the listed transactions that occurred

before late 2020 or 2021, when Mr. Ali was first associated with Mr. Taherzadeh at USSP.  Since the interactions with the nominee account holders in the listed  transactions occurred long before Mr. Ali held himself out as a law enforcement officer, those nominee account holders could not have felt pressured by Mr. Ali. Thus, counsel requested a clarification of that paragraph. At a minimum, counsel felt that the sentence should be clarified to be clear that it does not refer to the nominee account holders in the transactions set forth in the PSR.


IV.     THE POST-**<u>BOOKER</u>** SENTENCING FRAMEWORK.

<u>United States v. Booker</u>, 125 S.Ct. 738 (2005) marked the end of twenty years of mandatory federal sentencing guidelines.  The guidelines are advisory, and the sentence must be imposed in accordance with 18 U.S.C. § 3553(a), taking into account the sentencing guideline range.  Section 3553(a) directs sentencing courts to consider, *inter alia*, the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available.   Pursuant to § 3553(a), the Court must impose a sentence sufficient, but not greater than necessary, to comply with the following purposes set forth in paragraph (2) of the subsection:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Counsel submits that sentencing factors in this case do not suggest the need for a sentence above the bottom of the recommended guideline range.

## V.    A SENTENCE AT THE BOTTOM OF THE RECOMMENDED RANGE IS JUST AND  REASONABLE UNDER 18 U.S.C. § 3553(a).

### a.    Defendant's History And Characteristics.

Haider Ali's history, characteristics, and family circumstances strongly support a sentence at the bottom of the recommended range.  Mr. Ali is a 37 year old man with no prior juvenile or adult criminal convictions. He was born and raised for the first 14 years of his life in Pakistan. He attended formal schools in Karachi, Pakistan, and then came to the United States with his family in 2001.  They settled in Northern Virginia, where he attended Annandale High School. He graduated from high school in 2004, and attended some college in 2006.  In 2009 he became a naturalized U.S. citizen.

Mr. Ali has been working full-time and working very long hours for most of his adult life. He sacrificed his own education, and with it the promise of better employment opportunities in the future.  He has worked full-time and very long hours his entire adult life to support his family, and to make up for his lack of education.  He thought he was pursuing better employment and a better future when he got caught up in Mr. Taherzadeh's web of fraud and deceit. He is a devoted husband and father of four very young children.  One of his children suffers from very serious developmental and behavioral issues, and is extremely close to Mr. Ali and dependent on him for much of his daily stability.  Mr. Ali is now personally devastated by the fact that his actions will soon result in him being separated from his son, his other children, and the rest of his family, as he recognizes the dramatic effects it will have on them.

Counsel would note that the defendant has dealt with this case in a responsible manner, acknowledging his misconduct and entering into a plea agreement.  He has been on strict "house

arrest" conditions for 15 months.  He has been fully compliant with those extremely strict conditions.  He cooperated fully with counsel and provided the documentation he could to the pre-sentence report writer.  He has shown that he is fully committed to following any and all conditions set by the Court, which demonstrates that he is very amenable to Court supervision when he is released, and also demonstrates that he is not a risk to re-offend.

In short, Mr. Ali is a decent, responsible, caring, hard-working individual who made some very serious mistakes - in large part because he chose to put blinders on and associate with individuals already involved in misconduct.  He is a good husband, father, and family man.  He has done his best to take care of his family. He is remorseful and has worked hard to understand the vulnerabilities that contributed to his misconduct, and is 100% committed to making sure that he does not repeat his mistakes.  In sum, Mr. Ali's background, history, and characteristics support a finding that a sentence at the low end of the recommended range is sufficient.

**b.     Nature of the Offense Conduct**

While the offenses are serious, counsel believes that Mr. Ali's sacrifices for his family years ago took away opportunities, and have contributed to some of the financial difficulties and poor decision-making that has him before the Court.  As the character letters mention, Mr. Ali sacrificed his education in order to help his family after his father suffered a heart attack in 2005. He showed his true colors and family commitment in making that decision, and it allowed his siblings to go on with their educations and become successful professionals.  At the same time, Mr. Ali's career course shifted, and he joined the work force to help his family meet their financial obligations - initially helping his father in the limousine business, and then starting his own limousine company in 2009.  He enjoyed his time as a limousine driver, but the business side often seemed difficult, and even when business seemed to be good he was not always able to

- 19 -

keep it profitable.

Over the years, Mr. Ali made a number of efforts to make the business profitable. In 2016, Mr. Ali was introduced to Mr. Taherzadeh by a mutual friend.  Mr. Taherzadeh held himself out as the owner of a very successful company - AET Holdings. Mr. Ali had visions of getting a lucrative contract for his limousine business.  Instead, his vision became re-directed when Mr. Taherzadeh offered him an opportunity to become involved in AET Holdings.  As discussed above, Mr. Ali lost the money he put into those efforts, and he returned to the limousine business in debt.  To outsiders it might appear that Mr. Taherzadeh got the better of Mr. Ali, but seeing the best in everyone Mr. Ali never saw it that way.

Mr. Ali went back to the limousine business a little poorer, and in an effort to get his finances back on track he was referred to a few individuals from his community who were older, supposedly wiser, and purportedly had greater business experience.  Beginning in or about 2017, he began working with these individuals, and eventually in late 2018 he relinquished control over much of HSA's business and accounts to others. Mr. Ali remained active with the company, assisting in the day-to-day activities, but the others assumed much of the control over the business' finances during that time, and soon Mr. Ali became involved in the bank fraud scheme to which he pleaded guilty.  When Mr. Ali began to realize the extent of his legal troubles, he decided to get out of the limousine business and look for other employment opportunities.  At that time he learned from social media posts that Mr. Taherzadeh appeared to be doing very well in law enforcement with a successful company - USSP.  Mr. Ali decided to re-visit Mr. Taherzadeh, and as the Court well knows, Mr. Ali's renewed trust in Mr. Taherzadeh did not turn out very well either.

It appears evident that Mr. Ali exercised extremely poor judgment, and put his trust in individuals who were not worthy of that trust. Because of Mr. Ali's connection to the bank

- 20 -

accounts, and his day-to-day activities with the individuals involved in the bank fraud, he appears more culpable than he is.  In reality, other individuals involved in the scheme had the far greater connections and "know-how" needed for the scheme, and they played a very significant role. [9]

As for the USSP fraud, as discussed more fully above, the entity (USSP), the fictitious personas, and the use of both to fraudulently obtain luxury apartments was created and was being executed for nearly two years before Mr. Ali joined Mr. Taherzadeh.  The relationships with the USSS agents were developed by Mr. Taherzadeh, not Mr. Ali.  The relationships with the agents continued to be fostered almost exclusively by Mr. Taherzadeh, even after Mr. Ali joined USSP. The countless text messages and e-mails between Taherzadeh and the agents demonstrate that. There were very few communications between Mr. Ali and the agents, and those generally related to the times Mr. Taherzadeh asked Mr. Ali to assist with their parking problems or with other administrative issues at the Crossing.  Simply put, Mr. Taherzadeh is the one who befriended the agents.  Mr. Ali infrequently communicated with them, and did not become their friend.  While the scheme did continue for years and was sophisticated, both of those factors apply almost exclusively to Mr. Taherzadeh, not Mr. Ali. Thus, counsel submits that Mr. Ali's offense conduct should be viewed in that context, and therefore is far less serious than Mr. Taherzadeh's conduct.

Counsel would also note that his psychological vulnerabilities played a very significant role in the offense conduct, and is a mitigating factor in assessing the nature of the offense for him. [*See*, Exhibit 13 (Psychological Evaluation, pp 1, 8-9)] Psychological testing  determined that he is "highly suggestible", "overly trusting of others", and "assumes the best about anyone he meets".  Those psychological vulnerabilities played a huge part in his poor judgment, poor

---

[9]   It is more difficult to appreciate the mitigating circumstances regarding Mr. Ali's involvement in the scheme, as the other conspirators and the specifics of the scheme are not fully before the Court.

- 21 -

decision-making, and resultant involvement in the conduct that has him before the Court. He trusted individuals and assisted them in ventures that he came to know were improper.  Each time he continued his blind trust, not knowing how best to get out of the situations.  He went from the flames into the fire when he sought to put the bank fraud activity behind him and went to work with Mr. Taherzadeh. [*See*, Exhibit 13 (Psychological Eval)] Nevertheless, he was the follower and not the leader. Thus, the offense conduct should be viewed in that context.

Finally regarding Count Three, it is important to note that this offense reflects his conspiratorial responsibility for conduct with Mr. Taherzadeh, and is directly related to the other offense. Thus, counsel submits that the sentence for Count 3 should be concurrent to the sentence for the other offenses.

Wherefore, the nature and circumstances of the offense do not suggest a need for any sentence greater than the bottom of the recommended range.

**c.** **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, and to afford adequate general and specific deterrence.**

Mr. Ali has demonstrated that he takes this matter very seriously.  This is Mr. Ali's first criminal conviction, and will be his first time in prison.  Significantly, his arrest and federal prosecution had the desired effect - and will definitely deter him from any thoughts of criminal activity, or even the types of poor judgment that led him down that path. He is embarrassed and ashamed.  He is remorseful.  He feels the pain he has brought upon himself and his family.

In addition, he was initially detained in jail, and eventually released on "house arrest" conditions.  Thus, on some level he has been serving his punishment for the past 16 months, as he has been unable to leave his residence, except for a relatively few medical appointments, school enrollment for two of his children, and attorney conferences.   Thus, the low end of the

recommended sentencing range is sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence.

###   d.   Family Circumstances & The Need for Treatment in the Most Effective Manner Under 18 U.S.C. § 3553(a)(2)(D) Further Support the Imposition of a Probationary sentence.

There are additional sentencing factors in Mr. Ali's case which lend further support for not imposing a sentence greater than the bottom of the recommended range.  First, Mr. Ali's son has been diagnosed with developmental disorders. [*See*, PSR ¶ 96] Mr. Ali has been the main parent dealing with his son's doctors, treatment, and to his son's day-to-day management and care.  He has also played an integral role in enrolling his son in school and addressing his AEP needs. His daughter and other children are also very close to him, and he has been almost as important in their continuing development as they get ready to start school.  Simply put, the sooner he can return to them the better it will be for his children - particularly his son. Family circumstances can be a factor in determining a sentence.  *See generally*, *United States v. Schroeder,* 536 F.3d 746 (7th Cir. 2008); *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (defendant's care for minor son and elderly parents with medical conditions constituted extraordinary family circumstances); *United States v. Lehman*, 513 F.3d 805 (8th Cir. 2008 (effect of incarceration negatively affecting disabled son was a factor); *United States v. Cox*, 271 F. Supp 3d 1085 (S.D. Iowa 2017) (fact that defendant had 3 children who would suffer was a factor).  Thus, family circumstances and the need to provide for treatment for his son in the most effective manner combine to provide additional support for getting Mr. Ali home sooner, rather than later.

**e.**     **BOP Recommendations**:

Defendant recommends that the Court recommend that the BOP give Mr. Ali prior custody credit for his time on "house arrest", which has been tantamount to "official detention." Under 18 USC, section 3585(b), a defendant is entitled to credit "for any time he has spent in official detention prior to the date the sentence commences . . . ."   Counsel is mindful that BOP Policy Statement 5880.30 states that a "defendant is not entitled to any time credit off a subsequent sentence, regardless of severity or degree of restrictions, if such release was a condition of bond or release on own recognizance."   Defendant's release in this case, consistent with the practice in this jurisdiction, was pursuant to a "release order" that in effect imposed "home incarceration".   Although he is considered to be on release conditions, he has been confined to his residence except for a few expressly authorized family and medical appointments.   Notwithstanding the policy statement, counsel submits that it is reasonable for the home incarceration conditions to be treated as "official detention".   Otherwise, Mr. Ali will not get any credit for the 15 months of house arrest.   While the Court has no authority to make that determination for the BOP, the BOP often gives weight to judicial recommendations.   Thus, counsel is respectfully requesting a recommendation that Mr. Ali be afforded credit for his time on home incarceration as "official detention" for the time defendant has been confined to his residence.

At a minimum, counsel submits that the 15 months on home incarceration is a sentencing factor that mitigates in favor of a prison sentence at the bottom of the recommended range.

Counsel expects to provide the Court with Mr. Ali's designation recommendations at the time of sentencing.

- 24 -

**CONCLUSION:**

Mr. Ali is a first offender, who has accepted responsibility for his offense, and is making concerted efforts to put this matter behind him. He has demonstrated that he is a good person who made some serious mistakes, and had some serious lapses in judgment. His positive adjustment; his strong work ethic; his strong family and community ties, and his exceptional record of compliance with his conditions in this case all bode well for him when he returns to the community, and all suggest that he will not be at risk to re-offend. Counsel submits that the totality of the factors enumerated in 18 U.S.C. 3553(a) support the request for a sentence at the bottom of the recommended range, followed by supervised release with appropriate conditions. Such a sentence is sufficient and best satisfies the goals of sentencing in Mr. Ali's case.

In addition, counsel notes that the PSR confirms that Mr. Ali does not have the ability to pay a fine, and requests that a fine be waived.

Finally, based on Mr. Ali's records of compliance, he is an excellent candidate for "voluntary surrender". Moreover, counsel would note that self-surrender will reduce Mr. Ali's BOP classification score, which results in three point reduction in the BOP's classification score, which is likely to help him achieve a designation to a lower level facility which is more likely to have educational and/or vocational resources. Thus counsel urges the Court to allow Mr. Ali to remain on his current conditions pending voluntary surrender to the BOP.

Respectfully submitted,

/s/
Howard B. Katzoff (Bar # 348292)
717 D Street, NW Suite 310
Washington, D.C. 20004
(202) 783-6414
katzoffh@aol.com
Attorney for Haider Ali

– 25 –

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing sentencing memorandum has been filed via the Electronic Court Filing System (ECF), causing a copy to be served upon government counsel, this 31st day of July, 2023.

_/s/_____
Howard B. Katzoff