**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-CR-00133-2 (CKK)** |
| | : | |
| **HAIDER ALI,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S PRO SE MOTION FOR SENTENCE REDUCTION PURSUANT TO 18 U.S.C. § 3582(c)(2) AND AMENDMENT 821 TO THE UNITED STATES SENTENCING GUIDELINES**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant Haider Ali's motion titled Defendant's Pro Se Motion For Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(2) and Amendment 821 To The United States Sentencing Guidelines. ECF 121. The defendant does not meet the initial eligibility requirements for a sentence reduction under Part B of Amendment 821 to the Sentencing Guidelines as he possessed a firearm in connection with the offense. Furthermore, even if the defendant were eligible for a sentence reduction, given the egregiousness and enormity of the defendant's offense, where he and a coconspirator stole more than $750,000 from their victims, committed bank fraud, and impersonated federal law enforcement, he cannot show that the 18 U.S.C. § 3553(a) purposes of sentencing warrant a reduction to his sentence as required to prevail on his motion. The Court should therefore leave the defendant's sentence undisturbed and summarily deny his motion.

**Procedural and Factual History**[1]

On April 5, 2022, the defendant was charged by complaint for falsely assuming or pretending to be an officer or employee acting under the authority of the United States or any department, agency or officer in violation of 18 U.S.C. § 912. ECF 1 (Complaint). On April 19, 2022, the defendant was indicted for False Impersonation of an Officer in violation of 18 U.S.C. § 912 and Unlawful Possession of a Large Capacity Ammunition Feeding Device in violation of 7 D.C. Code § 2506.01. ECF 27 (Indictment). On September 29, 2022, the government filed a Superseding Information charging the defendant with Conspiracy, in violation of 18 U.S.C. § 371 (Count One); Bank Fraud, in violation of 18 U.S.C. § 1344(2) (Count Two); and Unlawful Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 D.C. Code § 2506-01(b) (Count Three). ECF 59 (Superseding Information). On October 5, 2022, the defendant pled guilty to the Superseding Information after entering into a plea agreement with the United States.

As early as June 2020, the defendant, together with his co-conspirators, started impersonating officers or employees of the United States government, specifically the Department of Homeland Security (DHS), the Department of Justice (DOJ), the Office of Personnel Management (OPM), other federal departments and agencies. They used their fraudulent identities to defraud apartment complexes (including a luxury apartment complex in the District of Columbia); ingratiate themselves with members of federal law enforcement and the defense community; and commit bank fraud.

[1] The procedural and factual history is primarily taken from the Government's sentencing memorandum. ECF 93 (Sentencing Memorandum).

**A. The Conspirators Use USSP to Impersonate Homeland Security Agents**

United States Special Police LLC (USSP) was a Washington, D.C., limited liability company, with a registered address associated with a residence maintained and controlled by his coconspirator, Arian Taherzadeh, at least as early as Spring 2020. The defendant helped fund USSP and pay for its expenses starting in January 2021. On USSP's website, USSP was described as a private law enforcement, investigative, and protective service headquartered in Washington, D.C. The website stated that USSP can provide law enforcement, protective services, and investigative services within a contracted jurisdiction. For years, the defendant and Taherzadeh represented themselves as officers of the United States Government, through their affiliation with USSP even though USSP was not associated or affiliated in any way with the United States Government, nor had it ever done business with the United States Government. On several occasions, the defendant and Taherzadeh sought to recruit individuals to join their USSP "task force" or "unit," which these individuals believed to be part of DHS and federal law enforcement. ECF 90 (Sentencing Memorandum) at 3. The defendant and Taherzadeh's impersonation of federal law enforcement was a critical and necessary component of the "recruitment process."

**B. Fraud Committed Against the Crossing Apartment Complex**

The Crossing is a luxury apartment complex located in Southeast Washington, D.C. The defendant conspired with Taherzadeh to use their assumed law enforcement personas and the entity USSP to maintain leases for multiple apartments in the Crossing apartment complex. The coconspirators used USSP, an entity that appeared to be part of the federal government, because they did not have the personal credit or funds to obtain an apartment in their own names.

The defendant and Taherzadeh lived at The Crossing apartment complex for an extended period of time and failed to pay rent and associated fees. When confronted by management about

their failure to pay rent and other fees, the conspirators would claim issues with USSP management and the general federal bureaucracy. On some occasions, they would use invented supervisors, "Kevin Fuller" or "Morgan Noble," who were represented to be the "Director" or "Special Agent in Charge (SAC)" of USSP, and, therefore, officials of the U.S. Government, to make requests or explain delays in payments. These false and fictitious personas were also created to make the USSP appear to be a legitimate organization, part of a larger government structure. As of June 22, 2022, the conspirators' conduct resulted in a loss to The Crossing of $306,879.37 and a loss of $7,854.50 to the manager of the building's parking garage.

Penthouse 5 at The Crossing was maintained and controlled by the defendant and Taherzadeh and later used as USSP's phony office. Within Penthouse 5, the defendant and Taherzadeh possessed, among other things: (1) a Glock 19 9mm handgun loaded with a large capacity ammunition feeding device, containing 17 rounds of ammunition, including one in the chamber, registered to the defendant; (2) seven rounds of .308 caliber ammunition, and an ammunition box with over 35 rounds of handgun ammunition; (3) unlicensed long gun components including a firearm barrel, weapon stock attachments, foregrips, a magazine cartridge and scope; (4) electronics devices including a significant quantity of surveillance equipment, approximately 30 hard drives, hard drive copying equipment, a computer server containing six modules, a machine to create and program Personal Identification Verification (PIV) cards and blank cards with embedded chips, a currency counter, several Subscriber Identification Modules (SIM) cards and antennas; and (5) law enforcement tactical gear and storage equipment including clothing with police insignias, police parking placards, a latent fingerprint kit, and equipment for breaching a door, including a sledgehammer, ram, Halligan tool, lock picking kit and axe.

The defendant and Taherzadeh also used their false law enforcement personas to gain access to security footage in the building as well as the apartment numbers and contact information for all of the residents. The conspirators' misrepresentations related to The Crossing included lying to law enforcement. On March 14, 2022, an incident occurred at the Crossing involving a resident and a mail carrier. Following the incident, the resident called MPD, who responded to the scene. At that time, the defendant, who was a friend of the resident, identified himself as an employee of DHS and offered to assist MPD in obtaining video surveillance from the incident.

Two days later, on March 16, 2022, the defendant called a United States Postal Service (USPS) Inspector regarding the March 14 incident. During the call, the defendant falsely identified himself as "an investigator with USSP Special Investigation's Unit, part of DHS." When the Inspector referenced obtaining the video from The Crossing, the defendant stated, "I may be able to get the video from the apartment," and further falsely stated that "my director can authorize subpoenas" and that "we've gotten subpoenas for other things before." When pressed as to what "things" they had obtained, the defendant stated "issues here at the apartment."

When confronted by the USPS Inspector, the defendant falsely stated "I don't think you understand law enforcement in D.C." The defendant further falsely claimed that he worked with the graduates of FLETC [the Federal Law Enforcement Training Center] and federal agents which he said were different than postal inspectors. When the USPS Inspector told him that he too was a federal agent and was a former USSS Special Agent, the defendant "thanked him for his service" and, soon after, said that he needed to cut the interview short due to other obligations.

Several days later, on March 21, 2022, USPS Inspectors conducted a follow-up interview with the defendant. During the interview, the defendant was asked why he previously falsely claimed that USSP was part of DHS. The defendant responded that he was just "implying to the

best of my own knowledge" and falsely claimed that USSP conducted investigations on behalf of DHS. The defendant further falsely stated that "DHS sends many cases to USSP. I'm an investigator at USSP and get assigned some of those." The defendant continued, falsely saying, "my work is don't ask, don't tell." The defendant further falsely claimed that he used to hold a federal security clearance. When the USPS inspectors noted that, if the defendant's cases were not classified, they could be discussed with other members of law enforcement, the defendant claimed "from all the videos I've watched and everyone I've talked to, it's best not to talk about my cases… I'm just being honest from my perspective." When asked how the defendant could obtain a subpoena, the defendant falsely stated that his supervisor, Taherzadeh, who was a HSI Special Agent, could request it.

After this follow-up interview with the defendant, the USPS Inspector received a text message, sent by the Defendant and Taherzadeh, from the defendant's phone. The text stated, among other things, "I am sorry. I got carried away and basically lied and I was trying to impressing [sic] a chick, just want to be honest with you! I was caught up in the moment and just wanted to feel like I was on the same level as you guys and I have realized my mistake, that's really stupid of me… I'm ashamed and embarrassed for my actions."

**C. Relationship with Secret Service Personnel Predicated on False Pretenses**

Beginning as early as Spring 2020, the defendant and his coconspirators began to ingratiate themselves with employees of the USSS because it helped to further their impersonation of law enforcement officers. For instance, the defendant and Taherzadeh offered two Secret Service employees rent-free use of apartments at the Crossing for over a year. Taherzadeh also provided a secret service agent's wife with use of what he falsely represented to be a "government vehicle."

Taherzadeh also provided this agent and his wife with a generator and a doomsday/survival backpack and offered to purchase them an AR-15 style rifle, valued at approximately $2,000.

**D. The Defendant's Bank Fraud**

From May 2017 through March 2021, the defendant engaged in a scheme to defraud federally insured financial institutions. It was executed as follows: First, the defendant helped individuals to open bank accounts in the name of straw businesses and to obtain debit cards. Then, he provided these individuals with cash to serve as an initial deposit and allow for subsequent debit card transactions. He would then engage in false credit and debit card transactions using those cards through a point-of-sale terminal, a device for processing card payments. Next, he would direct the proceeds of fraudulent transactions to bank accounts maintained and controlled by the defendant or third-party account holders assisted by the defendant. He would instruct (1) the accounts holders on the "debit side" of the transaction to withdraw the initial deposit while the debits were still listed as "pending"; and (2) the account holders on the "receiving side" of the transaction to withdraw the illegal proceeds.

In furtherance, of the fraud scheme, the defendant represented himself as a member of federal law enforcement to individuals that he assisted in opening straw bank accounts and retrieving the illegal proceeds. He touted his law enforcement credentials to pressure the participation of others in the scheme. He would also wear gear and clothing, indicating that he was a law enforcement officer.

In sum, the defendant, using bank accounts maintained and controlled by himself and third parties, caused the execution of debit and credit card transactions, totaling in excess of $550,000 but less than $1,500,000. And, as a result of the defendant's fraud, he derived more than $1,000,000 in gross receipts from one or more financial institutions.

On October 5, 2022, the defendant plead guilty to one count of Conspiracy, one count of Bank Fraud, and one count of Unlawful Possession of a Large Capacity Ammunition Feeding Device. ECF 63 (Plea Agreement). At sentencing on July 13, 2023, the Court applied multiple adjustments, including a 2-level upward adjustment for possessing a dangerous weapon in connection with the offense, and found that defendant was subject to a total offense level of 26. ECF 99 (Presentence Report) at 15; ECF 105 (Statement of Reasons) at 1. The defendant had no criminal history points and was in criminal history category I. ECF 99 (Presentence Report) at 16. ECF 105 (Statement of Reasons) at 1. The Court further found that defendant's total offense level of 26 and criminal history category of I corresponded to a guideline range of 63 to 78 months' imprisonment. ECF 105 (Statement of Reasons) at 1. The Court sentenced the defendant to a 68-month term of imprisonment. ECF 104 (Judgment) at 2.

On August 4, 2026, the defendant filed Defendant's Pro Se Motion For Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(2) and Amendment 821 To The United States Sentencing Guidelines. ECF 121. In this motion, defendant argues that Amendment 821 has lowered his guideline range and requests the low end of the amended guidelines. *Id*. at 2. The defendant is projected for release on September 3, 2027. (9/3/2026 BOP Inmate Profile).

## Argument

To obtain a sentence reduction pursuant to Amendment 821, defendant must show both that he is eligible for a sentence reduction and that the § 3553(a) factors warrant a reduction to his sentence. As explained below, defendant fails the first, eligibility step, and would not satisfy the second, discretionary step even if he were eligible for a reduction. The Court should therefore summarily deny his motion.

## I. Amendment 821 to the Sentencing Guidelines

On April 27, 2023, the Sentencing Commission submitted to Congress an amendment to the Sentencing Guidelines relating to criminal history. U.S. SENTENCING COMM'N, AMENDMENTS TO THE SENTENCING GUIDELINES 43-54 (2023), https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf (describing this amendment). This amendment is often referred to as "Amendment 821." Part A of Amendment 821 limits the impact of "status points" (*i.e.*, the additional criminal history points given to defendants for committing the offense while under another criminal justice sentence such as probation or imprisonment), *id*. at 43-35, while subpart 1 of Part B of Amendment 821 reduces the offense levels for defendants who did not receive any criminal history points—and whose offenses did not involve specific aggravating factors—by two levels, *id*. at 45-46. On August 24, 2023, the Sentencing Commission voted to give retroactive effect to both Part A and subpart 1 of Part B. *See* U.S. SENTENCING COMM'N, AMENDMENT TO THE SENTENCING GUIDELINES (Aug. 31, 2023), https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202308_RF-retro.pdf (discussing the Sentencing Commission's decision to make these provisions of Amendment 821 retroactive and the corresponding changes to the text of the policy statement governing retroactivity of amendments).

As relevant to defendant's motion, in subpart 1 of Part B of Amendment 821, the Sentencing Commission added a provision that now appears in § 4C1.1 and provides a 2-level reduction for certain offenders who have zero criminal history points. This new provision states:

**§ 4C1.1. Adjustment for Certain Zero-Point Offenders**

(a) ADJUSTMENT.—If the defendant meets all of the following criteria:

(1) the defendant did not receive any criminal history points from Chapter Four, Part A;

(2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);

(3) the defendant did not use violence or credible threats of violence in connection with the offense;

(4) the offense did not result in death or serious bodily injury;

(5) the instant offense of conviction is not a sex offense;

(6) the defendant did not personally cause substantial financial hardship;

*(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;*

(8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);

(9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and

(10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

decrease the offense level determined under Chapter Two and Three by 2 levels. (emphasis added).

The defendant fails the first step of this inquiry relating to eligibility as he was in possession of a firearm in violation of § 4C1.1(7). Specifically, at sentencing, he received a two-point enhancement for possessing a firearm. ECF 99 (Presentence Report) at 15; ECF 105 (Statement of Reasons) at 1. Therefore, there is no 2-level downward adjustment to his offense level, the defendant's guideline range remains 63 to 78 months, and he is ineligible for a sentence reduction.

## II. Even if the Defendant Were Eligible He Has Not Established that the Applicable § 3553(a) Factors Warrant a Sentence Reduction.

Even if the defendant were found to be eligible for a sentence reduction, he does not satisfy the second, discretionary step required to obtain a reduction under Amendment 821. Specifically,

he cannot show that the applicable § 3553(a) factors warrant a reduction to his sentence. His motion therefore must be denied.

In *Dillon*, 560 U.S. at 827, the Supreme Court emphasized that "§ 3582(c)(2) instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized . . . is warranted in whole or in part under the particular circumstances of the case." Section 1B1.10 of the Sentencing Guidelines similarly directs that "the court shall consider the factors set forth in 18 U.S.C. § 3553(a) in determining . . . whether a reduction in the defendant's term of imprisonment is warranted." *Id.* app. note 1(B)(i); *see also* U.S.S.G. § 1B1.10 background ("The authorization of such a discretionary reduction does not otherwise affect the lawfulness of a previously imposed sentence, does not authorize a reduction in any other component of the sentence, and does not entitle a defendant to a reduced term of imprisonment as a matter of right.").

Subject to the limits set forth in § 1B1.10(b), the Court may consider all pertinent information in applying the § 3553(a) factors and determining whether and by how much to reduce the defendant's sentence. In particular, the Court must consider public safety considerations, and may consider information regarding the post-sentencing conduct or situation of the defendant, whether positive or negative. *See, e.g.*, *United States v. Darden*, 910 F.3d 1064, 1068 (8th Cir. 2018). Application note 1(B)(ii) directs that "[t]he court shall consider the nature and seriousness of the danger to any person or the community that may be posed by a reduction in the defendant's term of imprisonment." Application note 1(B)(iii) further directs that "[t]he court may consider post-sentencing conduct of the defendant that occurred after the imposition of the original term of imprisonment." The application note explains that these factors are relevant in determining whether and by how much to reduce a sentence, but only within the limits set forth in § 1B1.10(b).

Thus, "[t]he grant of authority to the district court to reduce a term of imprisonment is unambiguously discretionary," even when the guideline range is actually reduced. *United States v. Vautier*, 144 F.3d 756, 760 (11th Cir. 1998). A district court has "substantial discretion" in deciding whether to reduce a sentence; even "[a]n agreement between the government and the defendant that a sentence reduction is appropriate does not bind the judge; nor is the judge's consideration of the question limited to the factors the parties regard as relevant." *United States v. Young*, 555 F.3d 611, 614 (7th Cir. 2009).

Accordingly, many courts have denied sentence reductions in situations where guideline amendments lowered the sentencing ranges. *See, e.g., United States v. Wilson*, 716 F.3d 50, 53 (2d Cir. 2013) (denial of sentence reduction was not an abuse of discretion, though earlier sentence reduction had been granted despite defendant's prison misconduct, and defendant had not engaged in any new prison misconduct); *United States v. Styer*, 573 F.3d 151, 154-55 (3d Cir. 2009) (denial based on nature of original criminal conduct); *United States v. Stevenson*, 332 F. App'x 261 (6th Cir. 2009) (unpublished) (reduction denied despite eligibility under amendment, based on disciplinary infractions in prison, and lengthy criminal record); *United States v. Dunn,* 728 F.3d 1151, 1159-60 (9th Cir. 2013); *United States v. Arceneaux*, 297 F. App'x 819 (10th Cir. 2008) (unpublished) (reduction denied due to disciplinary record in prison); *United States v. Melton*, 2008 WL 1787045 (W.D.N.C. 2008) (denial based on nature of offense); *United States v. Craig*, 2008 WL 1775263 (W.D.N.C. 2008) (denial based on the facts of the case); *United States v. Suell*, 2008 WL 2845295 (N.D. Tex. 2008) (motion denied because defendant benefitted from a favorable plea agreement in which charges were dismissed and the sentence was reduced); *United States v. Reynolds*, 2008 WL 2367254 (S.D. W. Va. 2008) (motion denied because defendant's criminal conduct was "nothing short of egregious"), *aff'd*, 309 F. App'x 703 (4th Cir. 2009)

(unpublished). *Cf. United States v. Sifford*, 2008 WL 2048387 (W.D.N.C. 2008) (in exercise of the court's discretion, it affords only a partial reduction, in light of the defendant's record), *aff'd*, 309 F. App'x 705 (4th Cir. 2009) (unpublished). *See also United States v. Marion*, 293 F. App'x 731 (11th Cir. 2008) (unpublished) (district court's consideration of the defendant's criminal history when denying a reduction motion was proper, even though this was the same factor it considered at his original sentencing hearing).

Here, the defendant cannot show that the § 3553(a) factors warrant a reduction to his sentence for two reasons. First, the defendant's crimes in this case were egregious in both their nature and their extent. The defendant, along with his co-conspirator, impersonated officers of the United States government and committed bank fraud for approximately two years. Specifically, the defendant impersonated Homeland Security agents and committed fraud against The Crossing apartment complex, the latter of which resulted in the loss of $306,879.37 to The Crossing and a loss of $7,854.50 to the manager of the building's garage. ECF 90 (Sentencing Memorandum) at 5. In terms of the bank fraud, the defendant derived more than one million in gross receipts. ECF 103 (Sentencing Transcript) at 38.

The defendant also falsely claimed that he participated in the capture of the wife of Joaquin El-Chapo Guzman, that he was a Calvin Klein model, and that he had a connection to a senior official with the Pakistani Intelligence Service. *Id.* at 26. In addition, using his false identification as law enforcement, he obtained security footage in The Crossing, obtained a list of the residents in The Crossing as well as their apartment numbers and contact information, and obtained five parking spaces. *Id.* at 30.

As the prosecutor at sentencing allocuted "it's not just happenstance that the defendant found himself in two different schemes, an impersonation scheme and a bank fraud scheme. He's

not unlucky. He's a criminal that was involved in multiple schemes that involved fraud and deceit and that involved firearms." *Id.* at 17. This was not a lapse in judgment, but a consistent choice to continually break the law. Moreover, his presentence report shows nothing in his background that excuses his behavior, and he has enjoyed ample personal and professional opportunities throughout his life. ECF 90 (Sentencing Memorandum) at 11.

Second, the defendant has had four disciplinary infractions while in prison, two of which are 100-level offenses, the "greatest-severity" level of infraction within the Bureau of Prisons (BOP). On May 17, 2024, the defendant was found in possession of a cell phone. (Exhibit A: 9/22/2026 Disciplinary Record). On December 27, 2025, the defendant again was found in possession of a cell phone. *Id.* In addition, he was given a formal pre-program warning for his vape use/vape possession prior to entering a drug treatment program. (BOP: 7/17/2025 Clinical Team Meeting Note). There were also "concerns regarding [his] involvement in the possible extortion of community members by utilizing outside assistance in obtaining PSR material regarding charges." *Id.* These offenses illustrate the defendant's inability to comply with rules within the Bureau of Prison.

The defendant's original 68-month sentence was a fair and appropriate sentence when the Court imposed it, and it remains a fair and appropriate sentence today. In sum, even if he were eligible, the defendant has not met his burden to show that the § 3553(a) factors warrant a reduction to his sentence, and his motion should be summarily denied.

## CONCLUSION

The defendant is not eligible for a sentence reduction, and even if he were, he has not established that the § 3553(a) factors warrant a reduction to his sentence. The Court should therefore summarily deny his motion for a sentence reduction.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

KACIE WESTON
Chief, Special Proceedings Division
MD Bar

THOMAS STUTSMAN
Deputy Chief, Special Proceedings Division
MN Bar

*/s/ Shehzad Akhtar*
SHEHZAD AKHTAR
Assistant United States Attorney
D.C. Bar 493635
Special Proceedings Division
601 D Street NW
Washington, D.C. 20530
(202) 252-7498
Shehzad.Akhtar@usdoj.gov

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon the defendant via mail on or about September 28, 2026:

Haider Ali
Reg. No. 95019-509
FCI THOMPSON
Federal Correctional Institution
1100 One Mile Road
Thomson, IL 61285

______/s____________
SHEHZAD AKHTAR
Assistant United States Attorney

# EXHIBIT A

```
  BOPJ2           *          INMATE DISCIPLINE DATA           *     09-22-2026
PAGE 001 OF 002   *     CHRONOLOGICAL DISCIPLINARY RECORD     *     10:39:22

REGISTER NO: 95019-509  NAME..: ALI, HAIDER
FUNCTION...: PRT        FORMAT: CHRONO     LIMIT TO ___ MOS PRIOR TO 09-22-2026

-------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 4356306 - SANCTIONED INCIDENT DATE/TIME: 08-22-2026 1400
DHO HEARING DATE/TIME: 09-14-2026 0945
FACL/CHAIRPERSON.....: TOM/S. BRUCE
REPORT REMARKS.......: I/M ADMITTED TO POSSESSION OF PRINTED STAFF EMAIL
   305  POSSESSING UNAUTHORIZED ITEM - FREQ: 1
        LP VISIT   / 60 DAYS / CS
                   FROM: 09-15-2026  THRU: 11-13-2026
        COMP:    LAW:    TO DETER LIKE FUTURE MISCONDUCT
-------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 4233945 - SANCTIONED INCIDENT DATE/TIME: 12-27-2025 2324
DHO HEARING DATE/TIME: 01-13-2026 0900            DHO REPT DEL: 01-23-2026 1200
FACL/CHAIRPERSON.....: HAZ/CRADDOCK
APPEAL CASE NUMBER(S): 1267512
REPORT REMARKS.......: DENIES POSSESSING CELL PHONE AND CONTRABAND
   108  POSSESSING A HAZARDOUS TOOL - FREQ: 2 ATI: EYC RFP:
        DIS GCT    / 41 DAYS / CS
        COMP:010 LAW:P   PLRA
        DS         / 15 DAYS / CS
                   FROM: 01-13-2026  THRU: 01-27-2026
        COMP:    LAW:    IN SHU SINCE 12-27-2025
DHO HEARING DATE/TIME: 01-13-2026 0900 REPORT 4233945 CONTINUED
        LP COMM    / 1 YEARS / CS
                   FROM: 04-06-2026  THRU: 04-05-2027
        COMP:    LAW:    TO DETER FUTURE MISCONDUCT
        LP PHONE   / 1 YEARS / CS
                   FROM: 04-06-2026  THRU: 04-05-2027
        COMP:    LAW:    TO DETER FUTURE MISCONDUCT
-------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 4144761 - SANCTIONED INCIDENT DATE/TIME: 07-08-2025 0730
DHO HEARING DATE/TIME: 10-31-2025 1145            DHO REPT DEL: 03-10-2026 1215
FACL/CHAIRPERSON.....: HAZ/CRADDOCK
APPEAL CASE NUMBER(S): 1273627, 1256104
REPORT REMARKS.......: DSCC - REHEARING. ADMITS CHARGE AT INITIAL HEARING.
                       DENIES CHARGE AT REHEARING.
   331  POSSESSNG A NON-HAZARDOUS TOOL - FREQ: 1
        DIS GCT    / 14 DAYS / CS
        COMP:010 LAW:P   PLRA. **DSCC THIS IS A REHEARING**
        LP COMM    / 270 DAYS / CS
                   FROM: 07-10-2025  THRU: 04-05-2026
        COMP:    LAW:    REHEARING. COMMISSARY SANCTIONS UPHELD
DHO HEARING DATE/TIME: 10-31-2025 1145 REPORT 4144761 CONTINUED
        LP PHONE   / 270 DAYS / CS
                   FROM: 07-10-2025  THRU: 04-05-2026
        COMP:    LAW:    REHEARING. TELEPHONE SANCTIONS UPHELD
-------------------------------------------------------------------------------
REPORT NUMBER........: 4144761 (REHEARD 10-31-2025 1145)
DHO HEARING DATE/TIME: 07-10-2025 1445
-------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 3939013 - SANCTIONED INCIDENT DATE/TIME: 05-17-2024 1215
DHO HEARING DATE/TIME: 12-16-2024 1100            DHO REPT DEL: 03-05-2025 1505
FACL/CHAIRPERSON.....: HAZ/CRADDOCK
APPEAL CASE NUMBER(S): 1212251
REPORT REMARKS.......: REHEARING / DENIES POSSESSING A CELL PHONE

G0002    MORE PAGES TO FOLLOW . . .
```

```
  BOPJ2          *          INMATE DISCIPLINE DATA          *     09-22-2026
PAGE 002 OF 002  *     CHRONOLOGICAL DISCIPLINARY RECORD      *     10:39:22


REGISTER NO: 95019-509  NAME..: ALI, HAIDER
FUNCTION...: PRT        FORMAT: CHRONO     LIMIT TO ___ MOS PRIOR TO 09-22-2026

DHO HEARING DATE/TIME: 12-16-2024 1100 REPORT 3939013 CONTINUED
   108  POSSESSING A HAZARDOUS TOOL - FREQ: 1 ATI: EYC RFP:
        DIS GCT    / 41 DAYS / CS
        COMP:010 LAW:P   DSCC - REHEARING/ ALREADY SANCTIONED
        DS         / 30 DAYS / CS / SUSPENDED 30 DAYS
        COMP:    LAW:    SUSPEND DS TIME PENDING CLEAR CONDUCT
        LP PHONE   / 180 DAYS / CC
                   FROM: 06-20-2024  THRU: 12-16-2024
        COMP:    LAW:    SANCTIONED ALREADY SERVED
-------------------------------------------------------------------------------
REPORT NUMBER........: 3939013 (REHEARD 12-16-2024 1100)
DHO HEARING DATE/TIME: 06-20-2024 1044
```

```
G0000    TRANSACTION SUCCESSFULLY COMPLETED
                               Page: 002/002
```